IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

ORIENT MINERAL COMPANY, and ) 
WIL-BAO MINERAL CO., LTD., )     Civil No. 2:98-CV-238BSJ
                              )
          Plaintiffs, )     **MEMORANDUM OPINION**
                              )     **& ORDER**
vs. )
                              )
BANK OF CHINA, )
                              )
          Defendant. )
                              )
                              )

**FILED**
CLERK, U.S. DISTRICT COURT
February 19, 2010 (9:48am)
DISTRICT OF UTAH

* * * * * * * * *

The above-captioned action came on for trial before this court sitting without a

jury on April 7-9, 12-16, and 19-23, 2004; the court made and entered Findings of Fact

and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) on January 26, 2005 (dkt. no.

338), and entered judgment the next day (dkt. no. 339).  Plaintiffs appealed, the Bank of

China cross-appealed, and on October 24, 2007, the court of appeals affirmed this court's

judgment in favor of the Bank of China dismissing the plaintiffs' claims, but reversed this

court's dismissal of the Bank's contingent counterclaim and remanded that claim to this

court for further proceedings.  *Orient Mineral Co. v. Bank of China*, 506 F.3d 980 (10th

Cir. 2007).  On February 28, 2008, plaintiffs filed a petition for a writ of certiorari in the

United States Supreme Court, which was denied on June 2, 2008.[1]  *Orient Mineral Co. v.*

*Bank of China,* 128 S. Ct. 2872 (2008).

This court received the court of appeals' mandate on November 15, 2007, and

calendared a status and scheduling conference for December 18, 2007.  At the December

18th hearing, counsel for the Bank of China indicated that the Bank had incurred over

$900,000 in attorney's fees while litigating this matter, and intended to pursue its

counterclaim for indemnification of those fees as against plaintiff Orient Mineral and Art

Wilson, Preston Jones and F. Thomas Eck, III, as individual directors of Orient Mineral,

but not as against plaintiff Wil-Bao Mineral.  The Bank also intended to seek

indemnification from R. Ellsworth McKee, who the Bank asserted to be the alter ego of

Orient Mineral, or in the alternative, Preston Jones' principal.

On January 25, 2008, the Bank of China filed a motion to amend its counterclaim,

which was briefed and argued on March 3, 2008.  (*See* Minute Entry, dated March 3,

2008 (dkt. no. 390).)  This court granted that motion (*see id.*; Order Granting Bank of

China's Motion for Leave to Amend Counterclaim, filed March 14, 2008 (dkt. no. 391)),

and the Bank filed its Amended Counterclaim on March 19, 2008 (dkt. no. 392).  On

April 2, Orient Mineral filed a motion to dismiss (dkt. no. 393), as did the individual

counterclaim defendants on April 16 (dkt. no. 400).  The motions to dismiss were briefed

---

[1]While the appeal was pending, the Bank of China filed a motion to review the Clerk's taxation of costs, hearing of which was deferred by this court until after the appeal had been decided.  (*See* Bank of China's Motion to Review Taxation of Costs, filed June 6, 2005 (dkt. no. 358).)  That motion was ultimately heard on March 20, 2009, and was taken under advisement.  (*See* Minute Entry, dated March 20, 2009 (dkt. no. 453).)

and argued on June 9, 2008, and taken under advisement. (*See* Minute Entry, dated June 9, 2008 (dkt. no. 425).)

Four days later, Orient Mineral filed a pleading styled as a "Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim" (dkt. no. 424), followed by a motion for entry of default on that counterclaim, filed August 25, 2008 (dkt. no. 427). In turn, the Bank of China filed a motion for summary judgment as to the merits of Orient Mineral's counterclaim on September 4, 2008 (dkt. no. 432), and on October 22, 2008, plaintiffs Orient Mineral and Wil-Bao filed a paper styled as a "Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment" under Fed. R. Civ. P. 60(b)(6) and 60(d)(3) (dkt. no. 439).

On March 18, 2009—one year from the date that the Bank of China filed its Amended Counterclaim for Indemnification (dkt. no. 392), and two days before a calendared hearing on all pending motions—plaintiff Orient Mineral filed a paper styled as an "Answer and Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim" (dkt. no. 452).

At the March 20th hearing, the court heard argument by counsel concerning the six pending motions and took the matters under advisement. (*See* Minute Entry, dated March 20, 2009 (dkt. no. 453).) Since that hearing, plaintiffs' counsel have filed three "supplemental memoranda" submitting additional argument and citing to additional

authorities concerning their October 22nd motion (dkt. nos. 454, 455, & 456).[2]

Having reviewed and considered the six pending motions and the twenty-three memoranda filed by counsel with respect to those motions,[3] and having heard and considered the arguments of counsel presented at both hearings on the same, the court now rules as follows: (1) the Bank of China's motion to review taxation of costs is granted; (2) Orient Mineral's motion to dismiss the Bank of China's Amended

---

[2]This court's local rules contemplate the filing of three memoranda concerning a motion: the movant's memorandum in support, an opposition memorandum and a reply. *See* DUCivR 7-1(b)(3) (2008). "No additional memoranda will be considered without leave of court." *Id.* Concerning supplemental citations of authority, the local rules say this:

> (5) <u>Citations of Supplemental Authority.</u> When pertinent and significant authorities come to the attention of a party after the party's memorandum has been filed, or after oral argument but before decision, a party may promptly file a notice with the court and serve a copy on all counsel, setting forth the citations. There must be a reference either to the page of the memorandum or to a point argued orally to which the citations pertain, but the notice must state, *without argument*, the reasons for the supplemental citations. Any response must be made, filed promptly, and be similarly limited.

DUCivR 7-1(b)(5) (2008) (emphasis added). Plaintiffs' counsel neither requested nor obtained leave of this court to file any of plaintiffs' three "supplemental" memoranda (dkt. nos. 454, 455, 456), and all three extend counsel's argument in support of plaintiffs' pending motions. Absent a motion to strike, the court will allow these memoranda to remain as a part of the record in this case, but all counsel are reminded that "[a]ll attorneys practicing before this court, whether admitted as members of the bar of this court, admitted pro hac vice, or otherwise as ordered by this court, are governed by and must comply with the rules of practice adopted by this court, . . ." DUCivR 83-1.1(g).

[3]These memoranda include the "Counterclaim Defendants' Memorandum in Opposition to Bank of China's Motion to Amend Counterclaim and Cross-Motion to Dismiss," filed February 15, 2008 (dkt. no. 384), and the "Bank of China's Reply Memorandum of Law in Further Support of its Motion for Leave to Amend its Counterclaim for Indemnification," filed February 29, 2008 (dkt. no. 388); though the motion to amend was already granted, both memoranda discuss the merits of the Bank's indemnification theory, which remains at issue.

The counterclaim defendants' "cross-motion to dismiss" embedded in Orient Mineral's February 15th opposition memorandum—filed *before* the individual counterclaim defendants had been formally joined as parties by the Bank's proposed Amended Counterclaim—ostensibly challenged the Bank's July 5, 2001 counterclaim. That pleading was superseded by the Bank's March 2008 amendment and thus lacked further legal effect. *See, e.g., In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 396 F.3d 922, 928 (8th Cir.), *cert. denied*, 546 U.S. 822 (2005). Consequently, the "cross-motion to dismiss" was rendered moot.

Counterclaim is granted; (3) the individual counterclaim defendants' motion to dismiss the Bank's Amended Counterclaim is granted; (4) Orient Mineral's motion for entry of default on the paper styled as a counterclaim to the Bank's counterclaim is denied; (5) the Bank of China's motion for summary judgment as to that pleading is granted in part and denied in part as moot; and (6) the plaintiffs' second motion for entry of default and Rule 60 motion for relief from judgment is denied in all respects.

**ANALYSIS**

As remanded by the court of appeals, the central issue now before this court appears to be relatively simple: whether Orient Mineral must indemnify the Bank of China for its "costs and expenses in this action (including its litigation costs and attorney's fees)," as pleaded in the Bank's July 5, 2001 answer and contingent counterclaim (dkt. no. 79), the dismissal of which became a subject of the Bank's cross-appeal to the Tenth Circuit. That issue has since been clouded somewhat by the Bank's amendment of its counterclaim to add Messrs. Wilson, Jones, Eck and McKee as individual defendants, and by the plaintiffs' persistent attempts to relitigate the entirety of their claims against the Bank of China—claims decided against them either on jurisdictional grounds or upon the merits, as reflected in this court's Findings of Fact, Conclusions of Law and Judgment, all of which were affirmed by the court of appeals. *See Orient Mineral*, 506 F.3d at 991-1005. The plaintiffs' "counter-counterclaim" asserts the same fraud and civil conspiracy claims and also seeks damages for the Bank's alleged

abuse of process and wrongful use of civil proceedings in pursuing its contingent counterclaim upon remand. Independent of the Bank's remanded counterclaim for indemnification, the plaintiffs also seek to set aside the judgment on the ground of alleged fraud upon this court and a post-mandate "admission" by the Bank of China as to jurisdiction, and seek further discovery and a new trial on all of their claims.

## A. Motion to Review Taxation of Costs

On May 27, 2005, the Clerk of the Court taxed costs against the plaintiffs in the amount of **$22,577.44**—an amount less than the **$44,414.23** claimed in the Bank of China's February 16, 2005 Bill of Costs (dkt. no. 342), and excluding an additional **$11,496.04** claimed in the Bank's "(Supplemental) Bill of Costs," filed February 24, 2005 (dkt. no. 343). (*See* Taxation of Costs, filed May 27, 2005 (dkt. no. 357).[4]) The Bank filed a timely motion for review of the Clerk's taxation of costs on June 6, 2005, *see* Fed. R. Civ. P. 54(d) (2007) (amended 2009); DUCivR 54-2(d) (1997), which has been briefed, argued and submitted for decision.

"Rule 54 creates a presumption that the district court will award costs to the prevailing party," a presumption that the prevailing party is entitled to recover its *taxable* costs, that is, its costs and expenses which qualify for reimbursement. *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 459 (10th Cir. 1995) (en banc). Such costs do not

---

[4]The Clerk noted that the Bank's supplemental bill of costs was filed beyond the twenty-day time period specified in the court's local rules for filing of bills of costs, *see* DUCivR 54-2(a) (1997), and therefore, the Clerk "lacks the authority to tax the costs in the supplemental cost bill," leaving it up to the court to decide whether those costs will be taxed. (Taxation of Costs, at [1].)

include every out-of-pocket expense that might be incurred by a party in the course of litigation. To be recoverable, a particular expense must fall into one of the categories of costs statutorily authorized for reimbursement. *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000). Under 28 U.S.C. § 1920 (2006), the Court may tax costs, *inter alia*, for (1) fees of the Clerk and Marshal; (2) fees of court reporters for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; and (4) fees for exemplification and copies of papers necessarily obtained for use in the case. Section 1920(6) allows reimbursement for the "[c]ompensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828."

The prevailing party bears the burden of demonstrating the amount of its recoverable costs, *see Allison v. Bank One-Denver*, 289 F.3d 1223, 1248 (10th Cir. 2002), and supporting documentation must accompany each bill of costs, including verification of each claim by declaration or affidavit as required by 28 U.S.C. § 1924. *See* DUCivR 54-2(a) ("Failure to itemize and verify costs may result in their being disallowed."). The costs and expenses claimed must also be reasonable and necessary. *See, e.g.*, *Battenfeld of America Holding Co., Inc. v. Baird, Kurtz & Dobson*, 196 F.R.D. 613 (D.Kan. 2000) (denying taxation of costs where items were not shown to be necessary to the trial of the case); *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995). "Taxing costs against a losing party requires two inquiries: (1) whether the cost imposed

on the losing party is recoverable and (2) if so, whether the amount assessed for that item was reasonable." *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000); *accord In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, 1148 (10th Cir. 2009) ("Our precedents establish that the amount a prevailing party requests 'must be reasonable.'" (quoting *Callicrate v. Farmland Indus., Inc.*, 139 F.3d 1336, 1339 (10th Cir. 1998))).

Having reviewed and considered the arguments of counsel, and having conducted a *de novo* review of the Bank's bills of costs and Clerk's assessments, this court concludes that at least as far as it goes, the Clerk's taxation of costs is substantially correct, for the reasons detailed by the Clerk. The Bank did not entirely meet its burden to show the amount and necessity of expenses claimed in its Bill of Costs for trial transcripts, particularly the added expense of daily transcript copies, and the Clerk's **$7,000** allowance reflects an appropriate adjustment for those deficiencies. *See also U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1248 (10th Cir. 1988) (affirming the district court's refusal to tax the additional cost of preparation of daily transcript). The Clerk properly taxed the Bank's claimed deposition transcript costs as reasonable and necessary expenses, less the amount of the additional fees for appearance, postage, etc., which are not generally taxable as transcript costs under § 1920(2), *see Hansen v. Sea Ray Boats*, 160 F.R.D. 166, 167 (D. Utah 1995) (Greene, J.), *viz.*, a taxable amount of **$9,740.44**. Likewise, the Clerk's computation of taxable witness expenses in the amount

of **$3,792.00** for three days' attendance at depositions and three days' attendance at trial, excluding compensation for additional days spent merely *observing* trial,[5] comports with the requirements of 28 U.S.C. §§ 1821 and 1920(3).[6]

The plaintiffs' objections to the Bank's cost bill pointed out deficiencies in the documentation supporting the Bank's claim of **$9,610.75** for exemplification and copies of papers *necessarily* obtained for use in this litigation, and in light of those deficiencies and the Bank's partial failure to meet its burden under Rule 54(d), 28 U.S.C. §§ 1920(4) & 1924, and DUCivR 54-2(d),[7] the Clerk's taxation of such expenses in the amount of **$2,000.00** appears to be reasonable under the circumstances. *See Tilton v. Capital Cities/ABC, Inc.*, 115 F.3d 1471, 1476 (10th Cir. 1997) (announcing that "we reject a

---

[5]At the hearing, plaintiffs' counsel conceded that the amount taxed by the Clerk for witness expenses is correct. (Transcript of Hearing, dated March 20, 2009, at 5:20-23 (Mr. Ludwig).)

[6]The Supreme Court has observed that "it is clear that in §§ 1920 and 1821, Congress comprehensively addressed the taxation of fees for litigants' witnesses." *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987).

[7]In its reply memorandum to plaintiffs' objections, the Bank described the expenses claimed for copies of papers simply as "internal ordinary office copying of counsel for the Bank." (Reply Memorandum in Support of Defendant Bank of China's Memorandum and Bill of Costs, filed March 21, 2005 (dkt .no. 354), at 8.) At the March 20, 2009 hearing, Bank counsel explained for the first time that the claimed copying costs were incurred in preparing exhibit binders for use at trial:

> MR. BRADY: . . . As to making copies of documents, the Court might recall, we had quite a lot of documents. We had document exhibit books. The books were used by everybody. We did a lot of work in terms of making sure they were coordinated. Actually Mr. Berger did that.
>
> We submitted all the documentation to show the copying charges. It actually -- if we had not done that, if we hadn't made copies of exhibits in advance, the course of trial would have been much more difficult and it would have taken much longer. Having the books really substantially expedited the process, and I submit the copying charges were justified and are reasonable.

(Transcript of Hearing, dated March 20, 2009, at 43:10-21 (Mr. Brady).)

bright-line rule and instead examine whether the circumstances in a particular case justify an award of costs for trial exhibits"); *Cleverock Energy Corp. v. Trepel*, 609 F.2d 1358, 1363 (10th Cir. 1979) ("The awarding of costs for preparation of exhibits is committed to the discretion of the trial court."); *Mikel v. Kerr*, 499 F.2d 1178, 1182-83 (10th Cir. 1974) (affirming the taxation of the costs associated with preparing a trial exhibit without discussing whether the district court approved the exhibit prior to trial).

Section 1920(6) provides for taxation of costs for "compensation of interpreters" —apart from the "salaries, fees, expenses, and costs of special interpretation services under section 1828," which special services the Clerk correctly points out are limited by § 1828(a) to criminal proceedings and civil actions initiated by the United States. The Clerk correctly noted that the trial in this case did not involve "special interpretation services" under § 1828, but did not address whether the Bank's claimed interpreter expenses are nonetheless taxable as "compensation of interpreters" under § 1920(6). The court concludes that such expenses are indeed taxable under § 1920(6), independent of § 1828,[8] and that the Bank should be awarded its claimed amount of **$5,531.83** for these expenses.

Concerning the Bank's "(Supplemental) Bill of Costs," the court is satisfied that the Bank has made "a convincing showing as to why the supplemental costs were not included in the timely filed bill." *Parts & Electric Motors, Inc. v. Sterling Elec., Inc.*,

---

[8] *Cf. Tilton v. Capital Cities/ABC, Inc.*, 115 F.3d at 1479 (noting district court's taxation of translation expenses in a private civil action as "compensation of interpreters" under 28 U.S.C. § 1920(6)).

1986 WL 10995, at *1 (N.D. Ill. 1986) (supplemental bill of costs denied where party "had ample opportunity to include this expense in the original bill of costs"). At least absent a showing of bad faith or actual prejudice to an opposing party, this showing appears to be none too arduous an obstacle—particularly in this instance, given the distances and language barriers involved. *See, e.g.*, *Miller v. Holzmann*, 575 F. Supp.2d 2, 4 n.3, 59 (D.D.C. 2008) (granting supplemental bill of costs where delay in submission of information resulted from unanticipated closure of the courthouse); *Garcia v. Berkshire Life Ins. Co. of America*, 2008 WL 821805 (D.Colo. 2008) (denying supplemental bill of costs where one-month delay in submission resulted from party's internal accounting system).[9]

The Bank's supplemental bill of costs seeks reimbursement for various expenses incurred by four of its witnesses outside of this District, and indeed, outside of the United States, in traveling from China to appear for depositions and at trial. Section 1821 provides that a witness who travels by common carrier should be paid "the actual expenses of [that] travel," requiring that "such a witness shall utilize a common carrier at the most economical rate reasonably available" and take "the shortest practical route in going to and returning from the place of attendance," and further provides that "[a]ll normal travel expenses within *and outside the judicial district* shall be taxable as costs

---

[9]*Dataq, Inc. v. Tokheim Corp.*, 736 F.2d 601, 605 (10th Cir. 1984), ciited by the plaintiffs, simply affirmed the district court's denial of an untimely bill of costs, without discussing the district court's discretion to allow a supplemental bill of costs where, as here, an initial bill of costs was timely filed.

pursuant to section 1920." 28 U.S.C. § 1821(c)(1), (4) (emphasis added).[10]

The accompanying Supplemental Declaration of Christopher Brady (dkt. no. 344) attests to the declarant's knowledge derived from his "review of the receipts, tickets, and other travel documents" that he received from the Bank pertaining to the four trial witnesses, and he avers that the expenses reflected in those papers were "necessarily incurred" in defending the claims in this case. In the Bank's Supplemental Memorandum of Costs (dkt. no. 345), counsel asserts that the requirements of § 1821 as to witness expenses have been met, and describes the papers attached to the supplemental cost bill in some detail.

Plaintiffs object that the supplemental cost bill is untimely, and that the papers accompanying the bill "were only in Chinese and were otherwise illegible." (Plaintiffs' Objections to Defendant's Memorandum and Bill of Costs, filed March 7, 2005 (dkt. no. 349), at 9-10.) As to the latter ground, the plaintiffs do have a point. The copy quality of the Chinese receipts is poor at best, and the text often appears unreadable—even if the court could read Chinese, which it cannot. The Bank furnished no verified English translations of the proffered receipts, leaving this court unable to conduct any meaningful independent review of the materials submitted by the Bank.

Recalling that items claimed as taxable costs "'should always be given careful

---

[10]In *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 445 (1987), the Supreme Court observed that the provisions of § 1821 and § 1920 "define the full extent of a federal court's power to shift litigation costs absent express statutory authority."

scrutiny,'" *In re Williams Securities Litigation-WCG Subclass*, 558 F.3d at 1147 (quoting *U.S. Industries*, 854 F.2d at 1245), the court has scrutinized the receipts submitted by the Bank with its supplemental cost bill, but to no avail.  Unable to determine for itself that the items proffered by the Bank substantiate the amounts claimed or that the requirements of § 1821 have been met, this court must deny taxation of the amounts claimed in the Bank's supplemental cost bill.

The Bank's motion for review of the Clerk's taxation of costs is granted, and upon further review, the court concludes that the correct amount of costs to be taxed in this case pursuant to 28 U.S.C. § 1920 is **$28,109.27**.

### B.  The Counterclaim Defendants' Motions to Dismiss

At the core of the Bank's Amended Counterclaim is the question whether the Bank is entitled to recover attorney's fees it has incurred in this litigation pursuant to the terms of the May 16, 1996 Resolution of Orient Mineral's board of directors, which promised "that the Board of Directors and Orient Mineral Co. shall hold the Bank of China harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are followed by said Bank of China."  (Plaintiffs' Exh. 8; *see* Findings of Fact & Conclusions of Law (Fed. R. Civ. P. 52(a)) and Order re: Pending Motions, filed January 26, 2005 (dkt. no. 338) ("Find./Conc."), at 24 ¶ 69.)

Orient Mineral and the individual Counterclaim Defendants contend that this language was mistaken surplusage, not genuinely part of the contractual agreement

between Orient Mineral and the Bank of China concerning the Bank's handling of a transfer of $3 million of Orient Mineral funds to accounts created for its Chinese joint venture, Wil-Bao Mineral; that it was a gratuitous promise not supported by consideration; and that the condition precedent of the hold-harmless clause itself was not satisfied. (Counterclaim-Defendant Orient Mineral Company's Memorandum of Law in Support of Motion to Dismiss, filed April 2, 2008 (dkt. no. 394) ("Orient Rule 12(b)(6) Mem."), at 3, 7-13.) Moreover, they argue, the Resolution itself purports to hold the Bank harmless "from all claims or liabilities of any kind," but does not expressly refer to attorney's fees—in contrast to other transactional documents prepared by Orient Mineral at that same time—and should not be read to so provide by implication, given the prevalent "American rule" concerning such fees. (*Id.* at 13-21; *see* Individual Counterclaim-Defendants' Memorandum of Law in Support of Motion to Dismiss, filed April 16, 2008 (dkt. no. 402) ("Indiv. Rule 12(b)(2)/(b)(6) Mem."), at 13-28 (same).[11]) Even if read to encompass attorney's fees, Orient insists that the hold-harmless language cannot apply to civil actions arising between the parties themselves. (Orient Rule 12(b)(6) Mem. at 21-24.)

The Bank responds that this court already found at trial that the May 16, 1996 Resolution's hold-harmless language was part of the agreement between Orient Mineral

---

[11]The individual counterclaim-defendants also argue that they are beyond the personal jurisdiction of this court under Fed. R. Civ. P. 12(b)(2); that the Resolution's hold-harmless language does not bind them as individuals, but actually serves as a release; and that the Bank's effort to impute personal liability to R. Ellsworth McKee under alter ego and agency theories is specious. (Indiv. Rule 12(b)(6) Mem. at 3-13, 31-37.)

and the Bank concerning the transfer of Orient's funds into accounts created for the Wil-Bao Mineral joint venture; that as part of that agreement, the hold-harmless promise was supported by consideration; and that the inclusion of the language was not the result of mutual or unilateral mistake. (Bank of China's Memorandum of Law in Opposition to Orient Mineral Company's Motion to Dismiss, filed April 28, 2008 (dkt. no. 408) ("Bank 12(b)(6) Opp."), at 3-7; *see* Find./Conc. at 188-89 ¶ 16.) The Bank contends that the hold-harmless language should be construed under Nevada law, not Utah law, and that in Nevada, the "legislature purposefully liberalized the awarding of attorneys' fees" by statute. (Bank 12(b)(6) Opp. at 8 (citing Nev. Rev. Stat. Ann. § 18.010 (2007).[12])

As the United States District Court for the District of Nevada has recently observed, "Under Nevada law, attorney fees are generally 'not recoverable absent a statute, rule, or contractual provision to the contrary.'" *Sentry Select Ins. Co. v. Meyer*, 594 F. Supp. 2d 1193, 1196 (D. Nev. 2009) (quoting *Horgan v. Felton*, 170 P.3d 982, 986

---

[12]Nev. Rev. Stat. Ann. § 18.010(2) reads:

2. In addition to the cases where an allowance is authorized by specific statute, the court may make an allowance of attorney's fees to a prevailing party:

(a) When he has not recovered more than $20,000; or

(b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party. The court shall liberally construe the provisions of this paragraph in favor of awarding attorney's fees in all appropriate situations. It is the intent of the Legislature that the court award attorney's fees pursuant to this paragraph and impose sanctions pursuant to Rule 11 of the Nevada Rules of Civil Procedure in all appropriate situations to punish for and deter frivolous or vexatious claims and defenses because such claims and defenses overburden limited judicial resources, hinder the timely resolution of meritorious claims and increase the costs of engaging in business and providing professional services to the public.

(Nev. 2007) (citation omitted)); *see also Rowland v. Lepire*, 99 Nev. 308, 662 P.2d 1332 (Nev. 1983) ("It is settled that attorney's fees are not recoverable absent a statute, rule or contractual provision to the contrary." (citing *Locken v. Locken*, 98 Nev. 369, 650 P.2d 803 (1982); *Von Ehrensmann v. Lee*, 98 Nev. 335, 647 P.2d 377 (1982))).  While as the Bank points out, the current language of Nev. Rev. Stat. Ann. § 18.010(2), as amended in 2003, "unambiguously reflects the Legislature's intent to liberalize attorney fee awards," *Trustees of Plumbers and Pipefitters Union Local 525 Health and Welfare Trust Plan v. Developers Sur. and Indem. Co.*, 120 Nev. 56, 62, 84 P.3d 59, 62 (2004), it does so only in the specific context of this statutory exception to the general rule regarding attorney's fee awards, and with particular emphasis as to frivolous, vexatious and bad-faith claims. *Id.*, 120 Nev. at 62-63, 84 P.3d at 62-63.  It remains true that "Nevada follows the American rule that attorney fees may not be awarded absent a statute, rule, or contract authorizing such award."  *Thomas v. City of North Las Vegas*, 122 Nev. 82, 90, 127 P.3d 1057, 1063 (2006); *see Frank Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 197 P.3d 1051, 1060 (Nev. 2008) ("A district court cannot award attorney fees unless authorized by statute, rule, or contract." (citing *Nevada Bd. Osteopathic Med. v. Graham*, 98 Nev. 174, 175, 643 P.2d 1222, 1223 (1982))).

Even assuming that, as the Bank suggests, Nevada law applies in this case, Nev. Rev. Stat. Ann. § 18.010(2) provides no basis for an award of attorney's fees to the Bank in this case.  For one thing, the Nevada courts have "extended to prevailing defendants

16

the requirement of a money judgment for recovery of attorney's fees under NRS

18.010(2)(a)." *Singer v. Chase Manhattan Bank*, 111 Nev. 289, 294, 890 P.2d 1305, 1308

(1995) (citing *Key Bank v. Donnels*, 106 Nev. 49, 787 P.2d 382 (1990); *Woods v. Label

Investment Corp.*, 107 Nev. 419, 812 P.2d 1293 (1991); *Nat'l Union Fire Ins. v. Pratt and

Whitney*, 107 Nev. 535, 543, 815 P.2d 601, 605 (1991); *Shupe & Yost, Inc. v. Fallon Nat'l

Bank*, 109 Nev. 99, 847 P.2d 720 (1993)).  Further, as Orient Mineral points out, this

court has made no finding in this case that the plaintiffs' claims against the Bank were

"brought or maintained without reasonable ground or to harass the prevailing party," Nev.

Rev. Stat. Ann. § 18.010(2)(b), and the Bank's Amended Counterclaim requests none.

(*See* Amended Counterclaim for Indemnification, filed March 19, 2008 (dkt. no. 392)

("Amended Counterclaim").)   If the Bank has a claim for attorney's fees at all, it

necessarily remains rooted in its contract with Orient Mineral.

Under Nevada law, like Utah law, parties to an agreement are not liable for

attorney's fees incurred in defending lawsuits arising out of the agreement in the absence

of a provision expressly providing for such liability—one explicitly stating that the party

seeking fees is entitled to recover them in the context of the particular dispute. *Compare

Semenza v. Caughlin Crafted Homes*, 111 Nev. 1089, 1097-98, 901 P.2d 684, 689 (1995)

(prevailing parties entitled to attorney's fees where agreement expressly provided that a

prevailing party be awarded "its reasonable costs  and expenses, including but not limited

to taxable court costs and reasonable attorneys' fee"), *with Pandelis Const. Co., Inc. v.*

*Jones-Viking Associates*, 103 Nev. 129, 132, 734 P.2d 1236, 1238 (1987) (property owner not entitled to attorney's fees under contract providing that owner may recover attorney's fees if the owner was forced to sue to enforce the contract where contractor, not the owner, sued); *Sandy Valley Associates v. Sky Ranch Estates Owners Ass'n*, 117 Nev. 948, 956, 35 P.3d 964, 969 (2001) (stating that "attorney fees cannot be recovered as a cost of litigation unless authorized by agreement, statute or rule"); *Young v. Nevada Title Co.*, 103 Nev. 436, 744 P.2d 902 (1987) ("It is well established in Nevada that attorneys' fees cannot be recovered unless authorized by agreement or by statute or rule." (citing *Sun Realty v. District Court*, 91 Nev. 774, 776, 542 P.2d 1072, 1074 (1975))); *Rowland v. Lepire*, 99 Nev. at 315-16, 662 P.2d at 1336-37 (concluding that unilateral attorney's fee provision in a contract does not imply reciprocal right to attorney's fees; "the trial court erred in basing the fee award on an implied agreement"); *James Hardie Gypsum Inc. v. Inquipco*, 112 Nev. 1397, 1405-06, 929 P.2d 903, 908 (1996) ("Attorney's fees are not recoverable absent an enabling statute or rule or a provision for such fees in a contract between the parties."); *Campbell v. Nocilla*, 101 Nev. 9, 12, 692 P.2d 491, 493 (1985) (stating that "[w]here a contract provision purports to allow attorney's fees in an action arising out of the terms of the instrument, we will not construe the provision to have broader application." (citing *First Commercial Title v. Holmes*, 92 Nev. 363, 366, 550 P.2d 1271, 1272 (1976))); *Securities Inv. Co. of St. Louis v. Donnelley*, 89 Nev. 341, 513 P.2d 1238, (1973) (noting that "signers of guaranty agreements are not liable for attorney

fees incurred in suits to enforce such agreements in the absence of an express provision for such liability").

Under either Nevada law or Utah law (the law of the forum), a non-breaching party who successfully defends an action brought by the other party to the agreement is not entitled to an award of attorney fees without a statutory, rule-based, or contractual authorization for such an award. The May 16, 1996 Resolution makes no express provision for the payment of attorney's fees by any party for any reason, and none may fairly be implied from the parties' negotiations leading up to the Bank's transfer of Orient Mineral's $2,999,990 investment into the Wil-Bao Mineral accounts at the LingBao branch. Nothing in either the trial testimony or the exhibits suggests that any potential liability for attorney's fees in the event of a lawsuit was ever considered or discussed in May of 1996 by the representatives of either Orient Mineral or the Bank, or that the language of the May 16, 1996 Resolution was intended to encompass prevailing-party attorney's fees in litigation arising among the parties themselves. *Cf. Dubler v. Moret*, 2009 WL 3711883, at *2 (Nev., Nov. 3, 2009) (reversing attorney's fee award, observing that "the record is devoid of any evidence that would suggest that the parties had any agreement or contract regarding attorney fees") (unpublished disposition).

Orient Mineral points to an unpublished disposition by the Ninth Circuit concluding that the Nevada courts would deny recovery of attorney's fees where the parties' agreement contains no attorney's fee provision. *See Crossroads Partners v. Utah*

*Crossing, Ltd.*, 191 F.3d 459 (Table), 1999 WL 701898 (9th Cir. 1999). The Bank has

cited no contrary authority from any source.

This much is clear: the Bank of China is not entitled to an award of attorney fees,

absent an express statutory, rule-based, or contractual authorization for such an award. In

remanding this question, the court of appeals noted that "[i]t is far from clear whether

Orient Mineral's resolution of May 16, 1996, agreeing to hold the Bank 'harmless from

all claims or liabilities of any kind,' includes the Bank's expenditure for its own

attorneys' fees." 506 F.3d at 1007. This court concludes that because the May 16, 1996

Resolution contains no express provision for attorney's fees,[13] and no Nevada or Utah

statute or rule provides for their recovery in the context of this action, the Bank may not

recover its attorney's fees incurred in this action. The Bank having failed to state a claim

for attorney's fees that is plausible on its face,[14] the counterclaim defendants' motions to

---

[13]In contrast, the indemnification clause at issue in *Sheehan & Sheehan v. Nelson Malley and Co.*, 121 Nev. 481, 117 P.3d 219 (2005), provided that "[Sheehan & Sheehan] indemnifies and holds [Nelson Thorne] harmless from . . . costs, damages or expense, *including but not limited to attorney's fees*, that arise directly or indirectly from this Agreement or the performance or non-performance of any act, activity, or service ... relating to any and all matters connected with the Practice or this Agreement . . . ." 117 P.3d at 226 (emphasis added). In *Karow v. Mitchell*, 110 Nev. 958, 878 P.2d 978 (1994), one party agreed to "'[i]ndemnify and hold harmless'" another party "'from any and all claims, demands, causes of action, damages, costs *and attorneys fees* incurred by it as a result of any claim, demand, or cause of action made or raised by any successor or assign of the [indemnitor] or anyone claiming through or under it." 878 P.2d at 979 (emphasis added).

　　　Counsel points to similar express attorney's fees provisions in other transactional documents drafted by Orient Mineral in May of 1996, suggesting that if Orient Mineral had intended to include attorney's fees among the "claims and liabilities" covered by the May 16th Resolution, it would have done so in explicit terms. (*See* "Counterclaim Defendants' Memorandum in Opposition to Bank of China's Motion to Amend Counterclaim and Cross-Motion to Dismiss," filed February 15, 2008 (dkt. no. 384), at 5; Orient Rule 12(b)(6) Mem. at 5.)

[14]Pursuant to *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a court may dismiss a pleading for failing to state a claim upon which relief may be granted under Fed.R.Civ.P. 12(b)(6) when that claim fails to plead "enough facts to state a claim that is plausible on its face." A claim is

(continued...)

dismiss the Bank's Amended Counterclaim are granted, and the Amended Counterclaim will be dismissed.

### C. Orient Mineral's Motion for Entry of Default & the Bank's Motion for Summary Judgment

On June 9, 2008, this court heard argument on the Rule 12(b) motions by Orient Mineral and the other counterclaim defendants to dismiss the Bank of China's Amended Counterclaim, and took the same under advisement. (*See* Minute Entry, dated June 9, 2008 (dkt. no. 425).) Four days later, Orient Mineral filed a paper styled as the "Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim," (dkt. no. 424), setting forth claims for fraud and civil conspiracy that largely reiterate the tort damages claims already pleaded in the Second Amended Complaint and presented by Orient Mineral and Wil-Bao Mineral at the trial of this action in April of 2004,[15] coupled with two additional claims for wrongful use of civil proceedings and abuse of process that arise from the Bank's pleading of its prior contingent counterclaims and the Amended Counterclaim.

The Bank of China filed no written reply to Orient Mineral's "Counter-

---

[14](...continued)
"plausible" when the facts alleged lead to the relief requested. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) ("This is not to say that the factual allegations must themselves be plausible; after all, they are assumed to be true. It is just to say that relief must follow from the facts alleged.").

[15]Ironically, Orient's counterclaim-to-a-counterclaim omits any pleading of a claim for breach of Orient's contract with the Bank, a claim that would clearly arise out of the same transaction as the Bank's Amended Counterclaim.

counterclaim,"[16] and on August 25, 2008, Orient Mineral filed a motion for entry of default (dkt. no. 427).  Three days later, the Bank filed a memorandum in opposition, arguing that entry of default would be improper because (1) the Federal Rules do not specifically authorize such a pleading, *see* Fed. R. Civ. P. 7(a), so no reply was required; (2) Orient Mineral's pleading of a counterclaim-in-reply to the Amended Counterclaim is inconsistent with its pending Rule 12(b)(6) motion to dismiss the Amended Counterclaim, then under advisement; (3) the filing of Orient Mineral's counterclaim-in-reply was untimely because a "party must serve an answer to a counterclaim within 20 days after being served with the pleading that states the counterclaim," Fed. R. Civ. P. 12(a)(1)(B) (2007), and the Bank's Amended Counterclaim had been served on Orient Mineral nearly three months earlier, on March 19, 2008 (dkt. no. 392); and (4) that one week prior to August 25th, counsel for Orient Mineral had been advised of the Bank's intent to file a motion for summary judgment and had at least implicitly agreed to afford the Bank additional time to file that motion.  (Bank of China's Memorandum of Points and Authorities in Opposition to Orient Mineral Co.'s Motion for Entry of Default, filed August 28, 2008 (dkt. no. 430), at 2-3.)

The Bank correctly asserts that the Federal Rules of Civil Procedure do not expressly authorize—or even refer to—such a pleading as a counterclaim-to-a-

---

[16]Plaintiffs' counsel refers to the Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim as their "Counterclaim," and at other times as their "Counter-counterclaim."  This court prefers to refer to this purported pleading as the plaintiffs' "counterclaim-in-reply," consistent with the relevant case authority.

counterclaim or a counterclaim-in-reply.  Indeed,

> Federal Rule 7(a), with its brief list of permissible pleadings and a flat prohibition against any pleading other than those listed, is designed to bring the pleading stage to an early close, eliminate unnecessary written pleadings, and provide a clear and definite guide as to precisely when the point of closure is reached.

5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1189, at 41

(3d ed. 2004) (footnote omitted).[17]  Prior to 1966, Rule 18(a) spoke of "a reply setting

forth a counterclaim," but that language has long been gone from the Rules.  *Id.* at §

1188, at 39.

Nevertheless, a handful of courts have fashioned an exception to Rule 7(a)

---

[17]Fed. R. Civ. P. 7(a) reads:

Only these pleadings are allowed:

(1) a complaint;

(2) an answer to a complaint;

(3) an answer to a counterclaim designated as a counterclaim;

(4) an answer to a crossclaim;

(5) a third-party complaint;

(6) an answer to a third-party complaint; and

(7) if the court orders one, a reply to an answer.

Of course, Rule 7(a) must be read together with Fed. R. Civ. P. 13(a)(1), which governs counterclaims:

A pleading must state as a counterclaim any claim that — at the time of its service — the pleader has against an opposing party if the claim:

(A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and

(B) does not require adding another party over whom the court cannot acquire jurisdiction.

permitting a plaintiff to assert a counterclaim in reply to a defendant's counterclaim. The leading current example of this exception-to-every-rule jurisprudence is *Feed Management Systems, Inc. v. Brill*, 518 F. Supp. 2d 1094, 1096 (D. Minn. 2007), which declared that "[a] counterclaim-in-reply is a permissible pleading when it is a compulsory reply to a permissive counterclaim."[18]

Even assuming that the Bank's Amended Counterclaim could fairly be

---

[18]*See also Erickson v. Horing*, 2000 WL 35500986, *10 (D. Minn. 2000); *Electroglas, Inc. v. Dynatex Corp.*, 473 F. Supp. 1167, 1171 (N.D. Cal. 1979) ("The court notes that although 'counterclaims in reply' are not expressly authorized by the Federal Rules of Civil Procedure, the weight of authority allows plaintiffs to file such pleadings if the counterclaims are compulsory."). Wright and Miller appear to endorse this exception:

> If the plaintiff has a claim arising from the same transaction as the one involved in the defendant's counterclaim--a claim that would constitute a compulsory counterclaim under Rule 13(a)--the plaintiff must assert it in the reply or risk being barred from bringing a later action on it. In this context, a counterclaim in the plaintiff's reply to the defendant's counterclaim seems entirely appropriate.

5 *Federal Practice and Procedure* § 1188, at 39. At the same time, they note the apprehensions expressed by another court:

> Rule 13 states that a pleading may state a permissive counterclaim and shall state any compulsory counterclaims. One such pleading which Fed. R. Civ. P. 7(a) authorizes is a reply to a counterclaim. Fed. R. Civ. P. 13 in conjunction with Fed. R. Civ. P. 7(a), thus authorizes a counterclaim to be stated in a reply to the counterclaim of the other party.
> * * * *
> In finding that a counterclaim in reply is a cognizable pleading under the circumstances of this case, we are not insensitive to the prospect (or perhaps we should say the specter) that the counterclaim in reply may indeed engender a reply to the counterclaim in reply. Trained as we have been in the post code-pleading practice of law, centuries removed from the legacy of Baron Surrebutter, we find that prospect appalling. . . . [F]or reasons of clarity and practicality, it would be better to treat the counterclaim in reply as an amendment to the complaint.

*Southeastern Indus. Tire Co., Inc. v. Duraprene Corp.*, 70 F.R.D. 585, 586, 588 (E.D. Pa. 1976) (footnote omitted) (citing 9 W. Holdsworth, *A History of English Law* 417 (1926)). The *Duraprene* court entered an order striking the plaintiff's counterclaim-in-reply and granting plaintiff leave to amend the complaint, noting that "[t]his result is recommended by Professors Moore, see 3 Moore's § 13.08, at 13-183, and Wright and Miller, see 5 Wright & Miller § 1188." *Id.* at 588 n.8.

characterized as permissive,[19] thus triggering the *Feed Management Systems* exception, Orient Mineral's counterclaim-in-reply does not prove to be a cognizable pleading for at least three reasons.

First, on June 13, 2008, Orient Mineral did not file "an answer to a counterclaim designated as a counterclaim" within the meaning of Rule 7(a)(3), and thus it filed no *pleading* that may state a counterclaim under Rule 13(a).

Second, in its March 14, 2008 Order (dkt. no. 391), this court specified that "Counterclaim Defendant Orient Mineral Company shall have twenty days from the date of this Order to file and serve its response to the Amended Counterclaim." Orient Mineral elected to file its Rule 12(b)(6) motion within that time period in lieu of filing a *pleading* in answer to the Bank's Amended Counterclaim—one that included its counterclaim-in-reply.[20]

Thus, even if Orient Mineral had filed a proper answer on June 13th, stating its counterclaim-in-reply as contemplated by Rules 7(a)(3) and 13(a), its filing was *untimely*.

Orient Mineral now argues that by filing a Rule 12(b)(6) motion within the twenty

---

[19] *Cf. Kalmanovitz v. G. Heileman Brewing Co.*, 649 F.Supp. 638, 642-44 (D. Del.1986); *Morgan v. Westinghouse Elec. Corp.*, 579 F.Supp. 867, 870 (N.D. Ga. 1984).

[20] Its Rule 12(b)(6) motion to dismiss remained pending on June 13, 2008 when Orient Mineral filed its purported counterclaim-in-reply, without filing an answer. Orient Mineral gives no indication that it intended its June 13th filing to supersede its Rule 12(b)(6) motion to dismiss. *See, e.g.*, *Holton v. Parekh*, 2007 WL 1427718, at *2 n.2 (M.D. Fla. 2007) ("In this case, Defendants filed an Answer and Affirmative Defense, which means a Motion to Dismiss would be deemed moot."). Plaintiffs' counsel appears to be aware of that potential effect. (*See* Plaintiffs' Reply in Support of Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment, filed February 25, 2009 (dkt. no. 449), at 14 n.13.)

days specified by the March 14, 2008 Order, it effectively granted itself an open-ended extension of time within which to file a responsive *pleading*—an extension that ranges far beyond twenty days, regardless of the terms of the court's March 14, 2008 Order. (*See* Plaintiffs' Reply in Support of Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment, filed February 25, 2009 (dkt. no. 449) ("Orient Rule 60(b) Reply"), at 5 & n.5 ("Orient filed **before** it has any obligation to answer" because "Rule 12(a)(4)(A) extends the time to answer or 'reply' until 10 days after a ruling on a motion to dismiss." (emphasis in original).)[21] Indeed, over a year later, on March 18, 2009, Orient Mineral filed an "Answer and Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim" (dkt. no. 452), two days before a calendared hearing

---

[21]In 2008, Fed. R. Civ. P. 12(a)(1)(B) required that "[a] party must serve an answer to a counterclaim or crossclaim within 20 days after being served with the pleading that states the counterclaim or crossclaim," and Rule 12(a)(4)(A) provided that the filing of a Rule 12(b)(6) motion to dismiss alters the Rule 12(a) time periods as follows: "if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 10 days after notice of the court's action." Here, this court has *granted* Orient Mineral's Rule 12(b)(6) motion to dismiss the Bank's Amended Counterclaim, so there now exists no pleading to which Orient Mineral can answer or reply, and the Rule 12(a)(4)(A) time period never became operative in this case.

As noted above, Orient Mineral reads Rule 12(a)(4)(A) to mean that the filing of a Rule 12(b)(6) motion *extends* the time for filing a responsive pleading under Rule 12(a)(1) (B) throughout the entire time period that the Rule 12(b)(6) motion remains pending before the court, thus permitting the moving party to file a responsive pleading at any time during that period, essentially at its own whim, regardless of the court's scheduling order. (*See also* Counterclaimant Orient Mineral Company's Reply Memorandum of Law in Support of Motion for Entry of Default by Clerk of Court, filed September 9, 2008 (dkt. no. 435), at 3 ("The motions to dismiss are still pending, and thus the time for Orient to answer the Bank's Counterclaim, under Rule 12(a)(4)(A), has not yet run, and Orient's Counter-Counterclaim is timely.").) It may be more accurate to say that a "Rule 12(b) motion ordinarily suspends the party's time for serving a responsive pleading, and that tolling will usually continue to run until the court has ruled on the pending motion." Steven Baicker-McKee, et al., *Federal Civil Rules Handbook* 399 (2009 ed.) (footnotes omitted); *Smith v. Rockett*, 2009 WL 3157345, (W.D. Okla. 2009) (finding that the time period for filing an answer "was tolled until the Court ruled on the motion to dismiss"); *F.D.I.C. v. Barth Sullivan Behr, LLP*, 2009 WL 3046559, at *4 (W.D.N.Y. 2009) (filing of a Rule 12(b)(6) motion "postponed the deadline for filing a responsive pleading until after its disposition"). As the previous footnote suggests, the filing of a responsive pleading while a Rule 12(b) motion is pending indicates that issue has been fully joined by the pleadings and that the Rule 12(b) motion has thus been rendered moot.

on motions, apparently to meet the Bank's Rule 7(a) objections to the form of its June 13, 2008 filing.[22]  Under the terms of this court's March 14, 2008 Order, that filing was also untimely.

Third, to the extent that Orient Mineral's purported counterclaim-in-reply simply restates the same tort damages claims against the Bank that were already pleaded, heard and dismissed in this case, it proves to be redundant of Orient Mineral's prior pleadings, and states no new claim to which the Bank need file an answer under the Rules.  Their dismissal having been affirmed on appeal, those claims have been conclusively resolved in the Bank's favor and may not be revived through the device of a purported counterclaim-in-reply.  *See Pittsburgh County Rural Water District No. 7 v. City of McAlester*, 358 F.3d 694, 711 (10th Cir.) ("It is 'a rule of practice, based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.'" (quoting *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991) (quoting *United States v. U.S. Smelting Ref. & Mining Co.*, 339 U.S. 186, 198 (1950)))), *cert. denied*, 543 U.S. 810, 811 (2004).

Plaintiffs' counsel insists that the Bank's post-remand revival of its counterclaim for indemnification opens the door to *all* of the plaintiffs' claims previously dismissed for

---

[22]At the March 20, 2009 hearing, plaintiffs' counsel referred to "the counter- counterclaim that Orient Minerals has filed and recently perfected by an answer and counterclaim two days ago, (Transcript of Hearing, dated March 20, 2009, at 7:13-15 (Mr. Ludwig)), explaining that "Orient has now, with a ratification from Wil-Bao, met any procedural objections the bank had to the counterclaim as a stand-alone document and not part of an answer and counterclaim pleading by filing two days ago an answer and counterclaim," (*id.* at 9:12-17), and that "we have now filed an answer and counterclaim two days ago that really moots the bank's procedural objections in several respects . . . ."  (*Id.* at 17:12-14.)

lack of jurisdiction, arguing that the pleading of the Bank's Amended Counterclaim invests this court with subject matter jurisdiction over Orient's counterclaim in reply under 28 U.S.C. § 1607(b),[23] which is part of the Foreign Sovereign Immunities Act, 28 U.S.C. §§1330, 1391(f), 1441(d) and 1602-1611 (2000) ("FSIA"). (Plaintiffs Orient Mineral Company and Wil-Bao Mineral Co., Ltd.'s Memorandum of Law in Support of Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment," filed October 22, 2008 (dkt. no. 440) ("Orient Rule 60(b) Mem.") at 6-9 (citing *In re Rio Grande Transport, Inc.*, 516 F. Supp. 1155 (S.D.N.Y. 1981)).

As the court of appeals points out, "The Bank made its counterclaim expressly contingent upon the district court's final determination adverse to the Bank on the Bank's affirmative defenses based upon the FSIA, "'including lack of subject matter jurisdiction, lack of personal jurisdiction, and improper venue,'" *Orient Mineral*, 506 F.3d at 1006, quoting the pertinent passage from the Bank's pleading:

> At this time, however, the Bank asserts the following
> contingent . . . counterclaim solely for the indemnification of
> the Bank's liability and costs and expenses in this action
> (including its litigation costs and attorneys' fees) and, as
> [previously] stated . . ., *solely predicated on a final
> determination adverse to the Bank* of the Bank's

_____

[23] 28 U.S.C. § 1607(b) reads:

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—
. . . .
(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; . . .

aforementioned affirmative defenses based upon the [FSIA].

*Id.* (quoting Answer of Bank of China to First Amended Complaint Including Contingent

Cross-Claim and Counterclaim for Indemnification, filed July 5, 2001 (dkt. no. 79), at

13.)   As the court of appeals then observed, this court "determined that it had subject

matter jurisdiction to consider the merits of Plaintiffs' claims, *to the extent they are based*

*upon the Bank's transferring $400,000 from Wil–Bao's account to a bank in Utah.*  The

condition on which the Bank based its counterclaim had thus occurred."  *Id.*  (emphasis

added).

The court of appeals thus concluded that the Bank's contingent counterclaim had

ripened, but the Bank's contingent counterclaim—*solely predicated on a final*

*determination adverse to the Bank*—ripened *only* with respect to the $400,000 transfer

because of the adverse jurisdictional ruling, and *not* the other four funds transfers of

which the plaintiffs would now complain, and as to which their claims were previously

dismissed for lack of jurisdiction under the FSIA.  Thus, if pleading of the Bank's

Amended Counterclaim opened the § 1607(b) jurisdictional "door," as plaintiffs' counsel

insists, the only "transaction or occurrence that is the subject matter of the [counter]claim

of the foreign state" under § 1607(b) is the $400,000 wire transfer—as to which the Bank

has already prevailed on the merits of all of the plaintiffs' claims.[24]  The court of appeals

---

[24]Contrary to plaintiffs' contention, their claims based on four other funds transfers do *not* "clearly arise out of the same 'transaction or occurrence' on which the Bank bases its counterclaim."  (Orient Rule 60(b) Mem. at 14.)  Plaintiffs' tort damages claims arise from five transactions involving funds in the *Wil-Bao Mineral*

(continued...)

expressly affirmed this court's "judgment in the Bank's favor on the merits of the claims involving that $400,000 transfer to Utah," 506 F.3d at 1007, and Orient Mineral cannot escape the effect of that judgment simply by pleading anew those same claims in its counterclaim-in-reply.

Fourth, to the extent that it asserts new claims alleging the baseless, frivolous or bad-faith pleading of the Bank's Amended Counterclaim in March of 2008, Orient Mineral pleads "a counterclaim that matured or was acquired by the party after serving an earlier pleading," (*viz.*, the plaintiffs' Second Amended Complaint), the filing of which requires leave of this court.[25] Orient Mineral neither requested nor obtained this court's permission to file its counterclaim-in-reply in June of 2008, in answer to the Bank's Amended Counterclaim or otherwise. *See* Fed. R. Civ. P. 15(d).[26]

Orient Mineral having filed no cognizable pleading on June 13, 2008, the Bank of China has not "failed to plead or otherwise defend" within the meaning of Fed. R. Civ. P. 55(a), and Orient Mineral's motion for entry of default is therefore denied. The Bank's motion for summary judgment on Orient Mineral's purported counterclaim-in-reply is

---

[24](...continued)
*Company* accounts *after* Preston Jones authorized the transfer of Orient Mineral's funds to the Wil-Bao joint venture at the May 27, 1996 meeting held at the Bank's LingBao Sub-branch. The Bank contends that it followed Jones' instructions in making that transfer. (*See* Amended Counterclaim at 3-4 ¶¶ 9-14.)

[25]Rule 13(e) reads: "*The court may permit* a party to file a supplemental pleading asserting a counterclaim that matured or was acquired by the party after serving an earlier pleading." (Emphasis added.)

[26]Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

granted in part, for the reasons explained above.  To the extent that the Bank's motion

addresses the substantive merits of Orient Mineral's Third and Fourth Causes of Action,

the Bank's motion is denied as moot.

### D.  Plaintiffs' "Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment"

### 1.  Orient Mineral's Second Request for Entry of Default

On October 22, 2008, with both its April 2, 2008 motion to dismiss the Bank's

Amended Counterclaim (dkt. no. 393) and its August 25, 2008 motion for entry of default

on its own counterclaim-in-reply (dkt. no. 427) still pending before the court, Orient

Mineral (joined by plaintiff Wil-Bao Mineral) filed a "Cross-Motion for Default Upon

Orient's Counterclaim and for Relief from Judgment" (dkt. no. 439).  Orient Mineral

reiterates its argument that the Bank is in default on Orient's counterclaim-in-reply, and

then asserts that "[b]y activating its contingent Counterclaim, the Bank has opened the

FSIA's jurisdictional doors to Orient's Counter-Counterclaim, pursuant to 28 U.S.C. §

1607(b)," and that "the four of five transfers this Court previously held were not before it,

are ***now*** indisputably before the Court" as pleaded in Orient's counterclaim-in-reply.

(Orient Rule 60(b) Mem. at 1-2 (emphasis in original).)   Relief under Rule 60(b) from

the judgment of this court dismissing all of the plaintiffs' claims, Orient continues, may

be grounded upon the "extraordinary circumstances" of a recent admission by Bank

counsel as to a "central jurisdictional fact" purportedly made in papers filed and at a

hearing held after remand by the court of appeals, and by the alleged fraud upon the court

perpetrated by the Bank and its counsel in the presentation of evidence at the April 2004 trial in this case.  (*Id.* at 2-3.)

Memoranda were filed in response (dkt. no. 445) and reply (dkt. no. 449), and Orient Mineral's October 22, 2008 motion was heard on March 20, 2009, and then taken under advisement.  (*See* Minute Entry, dated March 20, 2009 (dkt. no. 453).)  After the hearing, Orient Mineral filed three "supplemental" memoranda (dkt. nos. 454, 455, 456), elaborating upon its arguments.

As explained above, Orient Mineral's Rule 12(b)(6) motion has been granted and the Bank's Amended Counterclaim has been dismissed. Orient Mineral's purported counterclaim-in-reply is not properly before this court, also for the reasons explained above, and consequently, no default may or need be entered against the Bank under Rule 55(a).  To that extent, Orient Mineral's October 22, 2008 motion is denied.

In light of the dismissal of the Bank's Amended Counterclaim, and for the sake of clarity of the record, the paper styled as an "Answer and Counterclaim of Orient Mineral Company to Bank of China's Amended Counterclaim" (dkt. no. 452), filed on March 18, 2009 by Orient Mineral without prior leave of this court,[27] will be stricken as being both untimely, (*see* Order Granting Bank of China's Motion for Leave to Amend

---

[27]Plaintiffs made no motion for leave to file this pleading.  Instead, plaintiffs' counsel inserted a conditional request that Orient "be permitted to file a separate answer and counterclaim, as of right, without waiver or prejudice to its pending motion to dismiss" into a footnote in the Plaintiffs' Reply in Support of Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment.  (*See* Orient Rule 60(b) Reply at 14 n.13.)  Plaintiffs did not seek or obtain any ruling on this "request" before filing Orient's "Answer and Counterclaim" two days before the March 20, 2009 motion hearing.

Counterclaim, filed March 14, 2008 (dkt. no. 391)), and now moot.

### 2. Orient Mineral's Rule 60(b) Motion

The remainder of Orient Mineral's October 22, 2008 motion appears to seek relief

from judgment ostensibly pursuant to Fed. R. Civ. P. 60(b)(3), (5) and (6),[28] on grounds

having to do with the Bank's defense of the plaintiffs' damages claims at the trial of this

matter in April of 2004 and its pursuit of its Amended Counterclaim following remand.

Relief under Rule 60(b), however, is "extraordinary and may only be granted in

exceptional circumstances." *Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th

Cir. 1999) (quoting *Cashner v. Freedom Stores, Inc.*, 98 F.3d 572, 576 (10th Cir. 1996)

(internal quotation omitted)); *see Bud Brooks Trucking, Inc. v. Bill Hodges Trucking Co.*,

909 F.2d 1437, 1440 (10th Cir. 1990) (same). "Rule 60(b) is not intended to be a

substitute for a direct appeal," *Cashner*, 98 F.3d at 576 (citing *Morris v. Adams-Millis

Corp.*, 758 F.2d 1352, 1356-57 (10th Cir. 1985)), and its provisions are "not available to

allow a party merely to reargue an issue previously addressed by the court." *Id.* at 577.

---

[28]In pertinent part, Rule 60(b) reads:

On motion and just terms, the court may relieve a party or its legal representative from a final
judgment, order, or proceeding for the following reasons:
. . . .
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by
an opposing party;
. . . .
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment
that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

### a. Current Status of the January 27, 2005 Judgment & Order of Dismissal

Based upon this court's "Findings of Fact and Conclusions of Law (Fed. R. Civ. P. 52(a)) and Order re: Pending Motions" (dkt. no. 338), Judgment was entered on January 27, 2005 dismissing the plaintiffs' claims "on the merits as to any claim based upon the wire transfer of $ 400,000 by the Bank of China in Lingbao, Henan Province, People's Republic of China, to Zions First National Bank in Sandy, Utah, within the District of Utah, on or about the 28th day of August, 1996," and dismissing "the remainder of the Plaintiffs' action . . . for lack of jurisdiction pursuant to 28 U.S.C. § 1604 (2000)," a provision of the FSIA.[29]  Plaintiffs appealed, and as noted above, the court of appeals affirmed the Judgment—specifically  this court's "determination that it had subject matter jurisdiction to consider Plaintiffs' claims to the extent they were based upon the Bank's transferring $400,000 to a bank in Utah, and that the court lacked jurisdiction to consider

---

[29]As the Second Circuit explains:

> The FSIA is the sole source for subject matter jurisdiction over any action against a foreign state.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989).  Except as otherwise provided in 28 U.S.C. §§ 1605 to 1607, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604.  "Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (citation omitted).

*Cabiri v. Government of Republic of Ghana*, 165 F.3d 193, 196 (2d Cir. 1999).

Plaintiffs' other claims asserted against the Bank,"[30] and this court's "judgment in the Bank's favor on the merits of the claims involving that $400,000 transfer to Utah," remanding the matter only for further consideration of the Bank of China's counterclaim. *Orient Mineral Co. v. Bank of China*, 506 F.3d 980, (10th Cir. 2007). The plaintiffs filed a petition for a writ of certiorari with the United States Supreme Court, which was denied, *see* 128 S. Ct. 2872 (2008). This court received the court of appeals' mandate on November 15, 2007, and the Clerk docketed the same (dkt. no. 373).

### b. The Court of Appeals' Judgment & the Mandate Rule

By its affirmance, the dismissal of the plaintiffs' claims against the Bank of China became the judgment of the court of appeals, and the "law of the case" as far as this court is concerned. *See* 1B James Wm. Moore, et al., *Moore's Federal Practice* ¶ 0.404[1] at II-2 - II-3 (2d ed. rev. 1996) ("When a case is appealed and remanded, the decision of the appellate court establishes the law of the case, which *must* be followed by the trial court on remand." (emphasis in original; footnote omitted)). Therefore, that judgment is not subject to further adjudication in this court, and further consideration of the dismissal of

---

[30]This court made "provisional" findings and conclusions as to the *merits* of plaintiffs' claims concerning transactions apart from the $400,000 wire transfer, in the event that the plaintiffs prevailed on appeal as to their expansive theories of subject matter jurisdiction under the FSIA. (*See* Find./Conc. at 187-88 n.194.) The plaintiffs did not prevail on their jurisdictional theories on appeal, the dismissal of plaintiffs' claims for lack of jurisdiction was affirmed, and consequently any *provisional* findings as to the *merits* of those additional claims became a complete nullity, having no force or effect. This court's findings as to matters of jurisdictional fact and facts bearing upon the $400,000 wire transfer were never "provisional."

Contrary to the plaintiffs' recent assertions, this court's *jurisdictional* rulings do not rest upon any "provisional" findings, "hypothetical jurisdiction," (Orient Rule 60(b) Mem. at 13 n.3), or anything other than findings of jurisdictional fact based upon admissible evidence that was adduced at trial in April of 2004.

the plaintiffs' claims against the Bank falls beyond the scope of the remand to this court under the Tenth Circuit's mandate. (*See* Judgment, dated October 24, 2007 (certified copy of mandate received from the court of appeals November 15, 2007) (dkt. no. 373).) *See also Carpenter v. Rohm & Haas Co.*, 9 F.R.D. 535, 536-537 (D. Del. 1950) ("The Court of Appeals having affirmed this court without qualification, it becomes the duty of this court upon receipt of the mandate to proceed with the execution of the judgment and no more. No power exists, under Rule 60(b) or otherwise, to alter or amend a decision of the reviewing court. *Home Indemnity Co. of New York v. O'Brien*, 6 Cir., 112 F.2d 387."), *affirmed*, 180 F.2d 749 (3d Cir.), *cert. denied*, 340 U.S. 841 (1950).

According to the Tenth Circuit, an "important corollary" to the law of the case doctrine "known as the 'mandate rule,' provides that a district court 'must comply strictly with the mandate rendered by the reviewing court.'" *Ute Indian Tribe v. State of Utah*, 114 F.3d 1513, 1520-21 (10th Cir. 1997) (quoting *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1534 (10th Cir. 1992)), *cert. denied*, 522 U.S. 1107 (1998); *Huffman v. Saul Holdings Ltd. Partnership*, 262 F.3d 1128, 1132 (10th Cir. 2001) ("The mandate rule requires a district court to comply strictly with the mandate rendered by the reviewing court.").[31] Strict compliance with the mandate rule in this case requires this court to give effect to the dismissal of the plaintiffs' claims against the Bank,

---

[31]As the Tenth Circuit has explained, "The mandate consists of our instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those instructions." *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003).

including dismissal on jurisdictional grounds. *See Invention Submission Corp. v. Dudas*, 413 F.3d 411, 414-415 (4th Cir. 2005) ("once a case has been decided on appeal and a mandate issued, the lower court may not deviate from that mandate but is required to give full effect to its execution. . . . Because our order stated that the district court lacked jurisdiction, the court was not free to do anything else but to dismiss the case."). *Kerman v. City of New York*, 374 F.3d 93, 109-110 (2d Cir. 2004) ("Where the appellate court has decided a question of law, the lower court on remand lacks discretion to decide that question to the contrary."); 18B Charles Alan Wright, Arthur B. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4478.3 (2d ed. 2002). Law of the case and its corollary mandate rule are "intended to prevent continued re-argument of issues already decided, and to preserve scarce court resources-to avoid in short, Dickens's *Jarndyce v. Jarndyce* syndrome." *Copart, Inc. v. Administrative Review Bd., U.S. Dept. of Labor*, 495 F.3d 1197, 1200 (10th Cir. 2007) (quoting *Huffman*, 262 F.3d at 1132).

### c. Plaintiffs' Mandate Rule "Exceptions" & Rule 60(b) Theories

The plaintiffs now seek to avoid the effect of the mandate rule in this case, arguing that courts will depart from the law of the case where a decision "'was clearly erroneous and would work a manifest injustice,'" (Orient Rule 60(b) Mem. at 32 (quoting *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1241-42 (10th Cir. 2000)). "Here," Orient contends, "the Tenth Circuit applied a universally repudiated standard . . . to reach a clearly erroneous result" concerning jurisdiction under the FSIA, and "application of the law of

the case would work a manifest injustice." (*Id.*) They further argue that "[u]nder the mandate rule, the Court 'retains discretion . . . to reconsider issues on remand that were not expressly or implicitly decided by the appellate court,'" (Plaintiffs' Supplemental Memorandum in Support of Cross-Motion for Default Upon Orient's Counterclaim and for Relief from Judgment, filed April 14, 2009 (dkt. no. 454) ("Orient Rule 60(b) Supp."), at 2 (quoting 18 James Wm. Moore, *Moore's Federal Practice* ¶ 143.23(1)(b)(4))), and that a district court's "power to act on a Rule 60 motion has long been recognized by the Tenth Circuit, and Supreme Court," even after a judgment has been reviewed on appeal. (*Id.* at 2-3.)

> Of course the district judge is not free to flout the decision of the appellate court so far as it goes, but he should be free to consider whether *circumstances not previously known to either court* compel a new trial. If the trial judge goes too far, and grants, in effect, a rehearing of the appellate court's decision, the normal processes of review are still open.

11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2873, at 439-40 (2d ed. 1995) (emphasis added & footnotes omitted).[32]

As the Supreme Court explained in *Standard Oil Co. Of California v. United States*, 429 U.S. 17 (1976) (per curiam), "[l]ike the original district court judgment, the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events. Hence the district court is not flouting the mandate by acting on the motion," *id.* at 18 (citing *Federal Practice and Procedure* § 2873), at least

---

[32]Plaintiffs' first Supplemental Memorandum quotes this passage from the treatise in part, but omits the second sentence quoted above. (Orient Rule 60(b) Supp. at 3.)

so long as the motion is grounded upon matters not previously addressed by the courts.

In *Huffman*, the court of appeals observed that

> a district court may deviate from the mandate "under exceptional circumstances, including (1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has since come to light; or (3) if blatant error from the prior . . . decision would result in serious injustice if uncorrected."

262 F.3d at 1133 (quoting *United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996)).[33]

If the court of appeals' opinion and mandate covered the ground the movant addresses in his Rule 60(b) motion, the district court is bound by the mandate rule and has no authority to re-examine its final decision. *See Procter & Gamble*, 317 F.3d at 1126; *Huffman*, 262 F.3d at 1132-33.

### d. Rule 60(b)(3), 60(d)(3) & Fraud on the Court

Rule 60(b)(3) provides that relief from a judgment may be obtained for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party."[34] Rule 60(d) provides that "[t]his rule does not limit a court's power to:

---

[33]While a change in the governing law can potentially provide the basis for an exception to the mandate rule, this exception does not apply after the judgment becomes final, which occurs after the court of appeals has disposed of the appeal and the time for a petition for certiorari has passed. *See Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1521 (10th Cir. 1997); *Colo. Interstate Gas*, 962 F.2d at 1534.

[34]Rule 60(c)(1) states that a motion brought pursuant to Rule 60(b)(3) must be made "not more than a year after the entry of the judgment or order or the date of the proceeding," a period that is not tolled during the pendency of an appeal from the same judgment. *See King v. First American Investigations, Inc.*, 287 F.3d 91, 94 (2d Cir.), *cert. denied*, 537 U.S. 960 (2002); *The Tool Box, Inc. v. Ogden City Corp.*, 419 F.3d 1084, 1088-89 (10th Cir. 2005) (citing *King*). Rule 60(c)(1)'s one-year limit does not constrain the court's inherent power to grant relief where a judgment or order was obtained through fraud on the court. *King*, 287 F.3d at 95.

. . . (3) set aside a judgment for fraud on the court."[35]

Plaintiffs rely on the latter ground for relief, and as evidence of the Bank's alleged fraud on this court, the plaintiffs rehearse in detail essentially the same arguments concerning the credibility of the Bank's witnesses at trial, including the Bank's expert witness, that plaintiffs' counsel made at the time of trial in April of 2004. As new evidence of the alleged fraud, the plaintiffs point to a second legal opinion obtained by plaintiffs post-trial that corroborates the legal opinions proffered by their own expert witness at trial concerning the effect of Chinese regulations governing foreign currency transactions in 1996. Plaintiffs argue that this second opinion shows that two foreign exchange conversions of $40,000 and $50,000, transacted by the Bank on June 4 and 5, 1996, using funds from the Wil-Bao U.S. Dollar account "were unlawful on their face"—essentially as their expert witness had opined at trial—"from which a fact-finder would infer that the Bank collaborated with Yue" in misappropriating Wil-Bao's funds.

---

[35]In this Circuit, fraud on the court is "fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury." *Bulloch v. United States*, 763 F.2d 1115, 1121 (10th Cir. 1985). Fraud on the court "is thus fraud where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function—thus where the impartial functions of the court have been directly corrupted." *Id.*; *see United States v. Buck*, 281 F.3d 1336, 1342 (10th Cir. 2002) (same). Fraud on the court must be shown by "clear and convincing evidence." *Buck*, 281 F.3d at 1342; *Weese v. Schukman*, 98 F.3d 542, 552 (10th Cir. 1996).

"Fraud on the court claims merit separate analysis not only because they are exempt from the one year time-period for filing claims under Rule 60(b)(3), but also because they are much more difficult to prove." *Zurich North America v. Matrix Service, Inc.*, 426 F.3d 1281, 1291 (10th Cir. 2005) (citing 11 Charles Alan Wright & Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2860 & 2870 (2d ed. 1995)). For one thing, "Intent to defraud is an "absolute prerequisite" to a finding of fraud on the court." *Id.* (citing *Robinson v. Audi Aktiengesellschaft*, 56 F.3d 1259, 1267 (10th Cir. 1995) (discussing the required intent element); *see also Yapp v. Excel Corp.*, 186 F.3d 1222, 1231 (10th Cir. 1999) (same).

(Orient Rule 60(b) Mem. at 16.)[36]  Plaintiffs argue that the Bank's witnesses and Bank counsel "committed a fraud on the Court in presenting evidence that the Bank did not need written from SAEC for those [$50,000 and $40,000] conversions," and that this conduct "strongly suggests that the Bank colluded with Yue in making all of the transfers."  (*Id.* at 16-17.)

But this court did not enter judgment on the merits of the plaintiffs' claims concerning the $50,000 and $40,000 transactions, or any of the other transfers that plaintiffs complain of, apart from the $400,000 wire transfer on August 28, 1996.  Those claims were dismissed for lack of jurisdiction under the FSIA, based upon the failure of the plaintiffs to prove the requisite *jurisdictional* facts.  This court's jurisdictional determinations were expressly affirmed by the court of appeals.  *See Orient Mineral*, 506 F.3d at 991-1001, 1007.

Nothing in the plaintiffs' proffered second legal opinion concerning the June 1996 currency transactions alters the milieu of jurisdictional facts underpinning this court's dismissal of plaintiffs' claims under the FSIA.  The balance of the plaintiffs' "fraud on

---

[36]That single inference, *viz.*, that administrative non-compliance by the Bank proves the Bank's intentional collusion with Yue's embezzlement of Wil-Bao funds, serves as the linchpin of plaintiffs' fraud and conspiracy claims arising from those two transactions.  Absent some direct evidence of collusion between the Bank and Yue, that inference is not the sole inference that may be drawn from the evidence; nor is that inference compelling, highly probable, or even consistent with other evidence.  (*See* Find./Conc. at 47-62 ¶¶ 139-194; *id.* at 133-37 & nn.139-43.) On June 4, 1996—the same day as the $50,000 currency conversion transaction—"the Bank of China transferred US$ 1.2 million from the Wil-Bao U.S. dollar account to the Wil-Bao RMB account, after the SAEC approved the conversion of US$ 1.2 million to RMB on June 4, 1996. The transfer slip (PX-243) bears the stamps of Wil-Bao Company and the Sanmenxia office of the SAEC."  (Find./Conc. at 47 ¶ 140; *see also id.* at 62 ¶ 194 ($100,000 Wil-Bao U.S. dollar funds transfer by Bank on May 8, 1997 approved by SAEC).)

the court" allegations made in support of their Rule 60 motion mirrors the arguments made by plaintiffs' counsel at the time of trial concerning the same transactions, the same witnesses, the same evidence and the same inferences. (*See* Orient Rule 60(b) Mem. at 17-21; Orient Rule 60(b) Reply at 14-17; Orient Rule 60(b) Supp. at 5-13.) Unless this court was to exercise the sort of "hypothetical jurisdiction" so vehemently eschewed by plaintiffs' counsel,[37] this court has no authority to adjudicate the plaintiffs' remaining claims, order additional discovery or a new trial, regardless of the relative merits of the evidence presented at trial.

If anything, the plaintiffs' protracted wrangling with the particulars of Chinese banking and foreign currency regulations serves only to underscore the innately *Chinese* character of this dispute—the misappropriation in China of the funds of Wil-Bao Mineral, a Chinese joint venture purportedly investing in a Chinese Gold mine, whose funds were deposited at a local sub-branch of the Bank of China and disbursed by Yue Xiaoqun, the Chinese general manager of the Chinese joint venture, allegedly to local Chinese payees, save one $400,000 wire transfer to the United States about which Wil-Bao complains, and two prior transfers back to Orient Mineral ($135,000 and $63,250) through an intermediary, about which Wil-Bao does not complain. What Chinese banking and currency regulations were in force in Henan Province in mid-1996? Did the LingBao Sub-branch obtain the requisite administrative approval for all of Wil-Bao's currency

---

[37](*See* Orient Rule 60(b) Mem. at 11-13; Orient Rule 60(b) Supp. at 2 n.4.)

transfers in 1996 that required approval, according to local agency records? These questions seem more readily determinable in a local Chinese forum having jurisdiction over Chinese defendants and non-party witnesses,[38] and far afield from a federal district court in the District of Utah, several thousand miles away.[39] *See also Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007) ("A district court therefore may dispose of an action by a *forum non conveniens* dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant.")

### e. Rule 60(b)(5) & "Prospective Application"

Rule 60(b)(5) permits a party to obtain relief from a judgment or order if, among other things, "applying [the judgment or order] prospectively is no longer equitable," and

---

[38](*Cf.* Transcript of Hearing, dated March 20, 2009, at 66:7-9 (Mr. Ludwig) ("this Court invited us to file those claims in China, which we could have done");*id.* at 73:22 (Mr. Ludwig) ("Again, we could have filed in China.")

[39]Under the plaintiffs' theory of FSIA jurisdiction, any American financier may freely ship millions of dollars abroad for investment in local mining ventures in other countries, confident that if he suffers a loss, and if a state-affiliated bank is somehow involved in handling his funds, the investor may litigate any transactional disputes that may arise with that bank in the relative comfort, convenience and security of an American court, without ever really having to leave home. In affirming the lack of FSIA jurisdiction over such claims, the Tenth Circuit recently observed that

> the mere fact that an American corporation ultimately "suffered a financial loss" in the United States was insufficient "to place the direct effect of the defendants' actions in the United States." . . . To allow such a loss to be the basis for jurisdiction "would give the district courts jurisdiction over virtually any suit arising out of an overseas transaction in which an American citizen claims to have suffered a loss from the acts of a foreign state." . . . Such a result, we held, was inconsistent with Congress's intent to limit jurisdiction to those cases in which the act caused a "direct" effect. . . .

*Big Sky Network Canada, Ltd. v. Sichuan Provincial Government*, 533 F.3d 1183, 1190 (10th Cir. 2008) (citations omitted) (quoting *United World Trade, Inc. v. Mangyshlakneft Oil Production Ass'n*, 33 F.3d 1232, 1235-36, 1238-39 (10th Cir. 1994)).

"provides a means by which a party can ask a court to modify or vacate a judgment or order if 'a significant change either in factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'" *Horne v. Flores*, ___ U.S. ___, 129 S. Ct. 2579, 2593 (2009) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992)). Plaintiffs bear "the burden of establishing that changed circumstances warrant relief," *id.*, and argue that this court now has jurisdiction of their remaining claims against the Bank because after remand, (1) the Bank pleaded a non-contingent Amended Counterclaim against Orient Mineral; and (2) Bank counsel "admitted" facts establishing FSIA jurisdiction "based upon a commercial activity carried on in the United States by the foreign state" under 28 U.S.C. § 1605(a)(2).[40] If this court now has such jurisdiction, then applying the judgment and order dismissing plaintiffs' claims for lack of FSIA jurisdiction "prospectively is no longer equitable" within the meaning of Rule 60(b)(5), and plaintiffs should be allowed to proceed with discovery and trial on those claims. (Orient Rule 60(b) Mem. at 13 & n.3.)

As explained above, the pleading of the Bank's Amended Counterclaim did not

---

[40] 28 U.S.C. § 1605(a)(2) reads:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
. . . .
(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; . . . .

serve to extend this court's jurisdiction over Wil-Bao account transactions beyond the

$400,000 wire transfer, and as explained below, jurisdiction under § 1605(a)(2) has not

been established by a "judicial admission" on the part of Bank counsel.  Absent such

jurisdiction, the order dismissing plaintiffs' claims as to those transactions, affirmed by

the court of appeals, must stand, and it cannot be concluded that "it is no longer equitable

that the judgment should have prospective application,"  Fed. R. Civ. P. 60(b)(5), simply

because the plaintiffs disagree with that result.[41]  "Rule 60(b)(5) may not be used to

challenge the legal conclusions on which a prior judgment or order rests," *Horne*, 129 S.

Ct. at 2593, and the plaintiffs have not identified a significant change in factual

conditions or in law warranting relief under the Rule.

### f. Rule 60(b)(6) & "Extraordinary Circumstances"

Rule 60(b)(6) "permits the district court to reverse its order for 'any other reason

justifying relief from the operation of the judgment,'" *Searles v. Dechant*, 393 F.3d 1126,

1131 (10th Cir. 2004), "other than the more specific circumstances set out in Rules

60(b)(1)–(5)."  *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005) (citing *Liljeberg v. Health*

---

[41]Nor is it at all clear that the judgment in this case is "prospectively" applied within the meaning of Rule 60(b)(5). *See Dowell ex rel. Dowell v. Board of Educ.*, 8 F.3d 1501, 1509 (10th Cir. 1993)(observing that Rule 60(b)(5) requires challenged district court order to have prospective effect). To determine if a judgment has prospective application within the meaning of Rule 60(b)(5), courts examine "whether it is 'executory' or involves 'the supervision of changing conduct or conditions[.]'" *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1139 (D.C. Cir. 1988)( quoting *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431 (1855); and *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932)).  That an order requires future compliance does not necessarily bring it within the purview of Rule 60(b)(5). *Twelve John Does*, 841 F.2d at 1138.  "The construction of the Rule sought by [defendants], 'which apparently is to the effect that a judgment has prospective effect so long as the parties are bound by it, would read the word "prospective" out of the rule.' We are not inclined to adopt such a construction."  *Maraziti v. Thorpe*, 52 F.3d 252, 254 (9th Cir. 1995) (quoting *Schwartz v. United States*, 976 F.2d 213, 218 (4th Cir. 1992), *cert. denied*, 113 S.Ct. 1280 (1993)).

*Services Acquisition Corp.*, 486 U. S. 847, 863, n. 11 (1988); *Klapprott v. United States*, 335 U. S. 601, 613 (1949) (opinion of Black, J.)). Rule 60(b)(6) relief is even more difficult to attain and is appropriate only "when it offends justice to deny such relief." *Cashner*, 98 F.3d at 580 (quotation omitted). As the Court observed in *Gonzalez v. Crosby*, "our cases have required a movant seeking relief under Rule 60(b)(6) to show 'extraordinary circumstances' justifying the reopening of a final judgment." *Id.* 545 U.S. at 535. Thus, "a district court may grant a Rule 60(b)(6) motion only in extraordinary circumstances and only when necessary to accomplish justice." *Cashner*, 98 F.3d at 579 (citing *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 729 (10th Cir. 1993)); *Pierce v. Cook & Co., Inc.*, 518 F.2d 720, 723 (10th Cir. 1975) (en banc) (stating that "[r]elief under Rule 60(b)(6) 'is appropriate to accomplish justice' in an extraordinary situation" (quoting *Collins v. City of Wichita, Kansas*, 254 F.2d 837, 839 (10th Cir. 1958))).

As "extraordinary circumstances," the plaintiffs point to (1) the Bank's alleged concealment of its own failure to comply with Chinese banking regulations governing foreign currency transactions in 1996 (one of the same grounds asserted as fraud on the court under Rule 60(d)(3), *see* Part D.2.d, *supra*);[42] and (2) the "extraordinary" post-remand "admission" by Bank counsel that establishes a "central jurisdictional fact,"

---

[42]Again, the evidence of "fraud on the court" relied upon by the plaintiffs bears directly upon funds transactions involving the Wil-Bao accounts over which the court of appeals affirmed that this court has no jurisdiction under the FSIA, *Orient Mineral*, 506 F.3d at 1000, and the inferences that plaintiffs insist this court should now draw from that evidence as to the Bank's alleged collusion with Yue Xiaoqun in misappropriating Wil-Bao's funds do not alter the *jurisdictional facts* underpinning this court's rulings under the FSIA. *See* Part D.2.d, *supra*. As such, those inferences do not serve as an "extraordinary circumstance"justifying relief under Rule 60(b)(6) from the order dismissing plaintiffs' claims.

namely, that the contract between Orient Mineral and the Bank of China was formed in the United States by the initiation of Orient Mineral's $3 million wire transfer to China. (Orient Rule 60(b) Mem. at 25; *see also* Transcript of Hearing, dated March 20, 2009, at 9:7-11 (Mr. Ludwig) (describing the motion by "both plaintiffs . . . to set aside the judgment on the two grounds I had indicated earlier, the fraud on the Court and the extraordinary judicial admission").)

The in-court statement by Bank counsel that Orient Mineral finds so extraordinary is this:

> Mr. Ludwig made the point that there are two contracts here. And his – his idea is that the first contract was formed by the – by the receipt by Mr. Yue of the May 14th letter from the Bank of China and then Mr. McKee's subsequent transfer of the nearly $3 million to the Bank to be safeguarded. That is not the indemnification contract. The indemnification contract occurred when Mr. Wilson, Mr. Jones and Mr. Eck went to the Bank and presented the Orient board resolution to the Bank that said we will hold you harmless from all claims and liabilities of any kind whatsoever provided that you follow the instructions of Mr. Jones with respect to the disposition of the funds.
> . . . .
> I frankly don't disagree with him. I think there were two contracts. As I say, I think there was an initial contract you could construe it in terms of the sending of the money. And there was a second contract which was the indemnification contract.

(Transcript of Hearing, dated June 9, 2008, at 24:4-16, 30:18-20 (Mr. Brady).)[43]

---

[43] At the same time, Orient Mineral discounts Bank counsel's subsequent statement at the same hearing clarifying that "I just want to state the Bank's position that we don't agree that the contract was formed in the United States. We don't think that's what the record shows." (*Id.* at 45:16-19 (Mr. Brady).) *Cf. Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir. 1995) ("Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight.")

Using these two "extraordinary circumstances" as a springboard, plaintiffs' counsel launches into an elaborate reargument of the plaintiffs' theory of the case, both as to jurisdiction under the FSIA, (*see* Orient Rule 60(b) Mem. at 30-42; Orient Rule 60(b) Reply at 26-28), and the merits of plaintiffs' tort damages claims against the Bank. (*See* Orient Rule 60(b) Mem. at 17-21; Orient Rule 60(b) Reply at 14-17; Orient Rule 60(b) Supp. at 5-13.)

### g. Contract Formation and the Bank's "Judicial Admission"

Plaintiffs' counsel argues Bank counsel's "judicial admission"[44] at some length, urging this court to act upon a "two-contract" theory of the case that the plaintiffs themselves *reject*: according to counsel, "Plaintiffs have consistently argued the existence of one contract" between Orient Mineral and the Bank, (Orient Rule 60(b) Reply at 22), a contract under which all of the terms agreed to by the parties at the May 27, 1996 meeting are enforceable—with the sole exception of Orient Mineral's promise "that the Board of Directors and Orient Mineral Co. shall hold the Bank of China harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are

---

[44]"Judicial admissions  are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute," but "inconsistent statements made in the alternative are not formal, deliberate declarations that could reasonably be construed as judicial admissions."  *U.S. Energy Corp. v. Nukem, Inc.*, 400 F.3d 822, 833 n.4 (10th Cir. 2005) (internal quotation omitted); *see Guidry v. Sheet Metal Workers Int'l Assoc.*, 10 F.3d 700, 716 (10th Cir. 1993) (stating that "[j]udicial  admissions are formal admissions . . . which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." (internal quotations and citation omitted)).  Statements in briefs "may be considered admissions at the court's discretion," *Guidry*, 10 F.3d at 716, but generally, "courts are reluctant to treat opinions and legal conclusions as judicial admissions." *Z.J. Gifts D-4, L.L.C. v. City of Littleton*, 311 F.3d 1220, 1233 (10th Cir. 2002).

followed by said Bank of China," as set forth in Orient's May 16, 1996 Resolution. (*Id.* at 22-23 n.21.)

Plaintiffs' counsel insists in its memoranda and in argument presented at the June 9, 2008 and March 20, 2009 hearings that Orient Mineral formed its contract with the Bank simply by wiring its money to the LingBao Sub-branch through the Bank's New York office in response to Mme. Liu's May 14, 1996 letter,[45] and that "'submittal of the Orient resolution, license and chop'" as specified in the May 14th letter "'was, at most, a condition precedent to the performance of the Bank's obligation to follow the designated representative's instructions.'"[46]

This argument sidesteps this court's existing findings of fact and conclusion of law on this precise point, namely, that the requisite meeting of the minds for contract formation occurred at the May 27, 1996 meeting of the parties at the Bank's LingBao Sub-branch when all of the material terms were communicated among and mutually assented to by the parties, including Orient's designation of Preston Jones to exercise exclusive control over the wired funds as set forth in its May 16, 1996 Resolution and the

---

[45]Plaintiffs made essentially the same argument to the court of appeals. (*See* Response and Reply Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 25 ("Orient unconditionally accepted the May 14th offer by wiring its funds in the U.S., at which moment the contract was fully formed."); *but see* Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 20 ("Accepting this offer by letter and board resolution prepared in the United States on May 16, 1996 designating Jones as its representative, and in reliance on the Bank's representations, Orient wired US $3 million to the Bank's branch in Lingbao, China.")

[46](Orient Rule 60(b) Reply at 22-23 n.21 (quoting Response and Reply Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 27).)

Bank's agreement to follow Jones' instructions concerning those funds—*the central premise of Orient's theory of this case.*[47]

Nothing in Mme. Liu's May 14th letter explicitly obligated the Bank to "follow the instructions" of Preston Jones as Orient's sole representative with authority over the disposition of Orient's funds, should Orient choose to transfer its funds to the LingBao Sub-branch. As translated by plaintiffs' expert at trial, the letter advised that "[a]fter the funds are transferred, our bank will be responsible for safekeeping these funds," and that

> Mr. Yue Xiaocun must bring to our bank the business license of ORIENT MINERAL CO., the company chop, and a company authorization letter, and go through the formalities, so that the funds can be used in the joint venture in accord with arrangements made by the representative of the American party.

(Find./Conc. at 21-22 ¶ 62 (quoting PX-235).) Recalling that Mr. Yue had asked the Bank to open a temporary U.S. dollar account in the name of Orient Mineral, Mme. Liu's May 14th letter spells out the performance required of Yue and Orient Mineral to *open the account* so that Orient's funds received by the Bank may be used in its Chinese joint venture.[48] More was required than simply the wiring of funds to LingBao, and "[a]n

---

[47]As this court noted in its findings, "Mr. Jones testified that Orient Mineral's agreement with the Bank 'was to protect and follow,' that is, the Bank agreed to protect the wired funds and 'follow my direction' as to the disposition of those funds in making the Wil-Bao investment. (Tr. 4/8/04, at 6:16-18 (Mr. Jones).)" (Find./Conc. at 122 n.131.)

[48]As plaintiffs' counsel explained to the court of appeals, on May 13, 1996, Art Wilson had faxed a letter instructing Yue Xiaoqun to obtain a "Letter from the Bank of China, LingBao" confirming that it would accept Orient's $3 million in a "temporary, special holding account," preferably in Orient's name, and that "[t]he Bank Letter must also state that the funds will be held by the Bank until Preston arrives in LingBao, on or about May 20, and that he has sole authority to distribute those funds." (Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 18 (quoting PX-3); *see also* Find./Conc. at 19-20 ¶
(continued...)

acceptance must comply with the requirements of the offer as to . . . the performance to be rendered." *Restatement (Second) of Contracts* § 58 (1981).

As this court previously found:

350.  In response both to the bank's letter and Mr. McKee's express conditions on his US$ 3 million loan, the Orient Mineral directors adopted the May 16, 1996 Orient Mineral board resolution and Mr. Eck drafted its cover letter, establishing that Preston Jones was the sole and exclusive person to act on behalf of Orient Mineral with respect to the disposition of all funds to be deposited in the Bank of China's Lingbao Sub-branch, Henan Province, by wire transfer from Mr. McKee; and proposing that Orient Mineral would "hold the Bank of China harmless from all claims or liabilities of any kind whatsoever, provided the directions of Preston Jones are followed by said Bank of China." (PX-8.)

351.  These particulars were communicated to Mr. Wang, Mme. Liu and Mme. Zhou, both verbally and in writing, at the May 27, 1996 meeting.

352.  On May 27th, the bank officers acknowledged these terms and proceeded to transact business involving the temporary Orient Mineral Company account in conformity with them.
. . . .

363.  The terms of the contract between Orient Mineral and the Bank of China, formed in Lingbao, China, include the Bank's promise to receive and keep safe Orient Mineral's funds when wired to the Bank, awaiting further instructions by Orient Mineral's designated representative, and Orient Mineral's performance in (*i*) wiring US$ [3] million to the Bank's Lingbao Sub-branch; (*ii*) designating Preston Jones as Orient Mineral's representative with authority to dispose of those funds; and (*iii*) its offer to hold the Bank harmless provided the directions of Preston Jones are

---

[48](...continued)
58.)  Upon receipt from Yue of a copy of the Bank's May 14th letter, Wilson prepared a rough draft interpretation of the letter with the help of a Chinese restauranteur in Carson City, Nevada, that included this language: "Funds can only by US Rep. specify who can use funds and release."  (Find./Conc. at 21 n.19 (quoting PX-6); see Transcript of Trial, dated April 14, 2004, at 61:8-19 (Mr. Wilson).)  At trial, plaintiffs' expert did not translate the May 14th letter to say that.  (*Id.* at 21-22 ¶ 62 (quoting PX-235).)  Perhaps Wilson's rough draft interpretation of the May 14th letter says what Wilson *expected* the letter to say, in light of his prior instructions to Yue.

followed by said Bank of China," as those terms are reflected in Mme. Liu's May 14th letter as it was understood at that time by the directors of Orient Mineral as well as Orient Mineral's May 16th board resolution and cover letter (PX-8), first presented to the Bank at the May 27, 1996 meeting.

. . . .

16. The contract between Orient Mineral and the Bank of China was formed by the conduct of Orient Mineral in (i) wiring US$ 3 million to the Lingbao Sub-branch, (ii) designating Preston Jones as Orient Mineral's sole representative with authority to dispose of those funds, and (iii) promising to hold the Bank harmless if Jones' instructions are followed (PX-8), in consideration for the Bank's promise to receive and safeguard those funds, so that the funds can be used in the joint venture in accord with arrangements to be made by Orient Mineral's designated representative, as set forth in Mme. Liu's letter of May 14, 1996 (PX-5).

(Find./Conc. at 122, ¶¶ 350-52; 125-26 ¶ 363; 188-89 ¶ 16.)

As recently explained by the Utah Court of Appeals,

"It is fundamental that a meeting of the minds on the integral features of an agreement is essential to the formation of a contract." *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996). Thus, a binding contract exists where it can be shown that the parties had a meeting of the minds as to the "integral features of [the] agreement" and that the terms are sufficiently definite as to be capable of being enforced. *Prince, Yeates & Geldzahler v. Young*, 2004 UT 26, ¶ 13, 94 P.3d 179 (internal quotation marks omitted).

*LD III, LLC v. BBRD, LC*, 2009 UT App 301, ¶ 14, 221 P.3d 867, 872; *see Nielsen v. Gold's Gym*, 2003 UT 37, ¶ 11, 78 P.3d 600, 602 (stating that "'a meeting of the minds on the integral features of an agreement is essential to the formation of a contract'" and that "'[a]n agreement cannot be enforced if its terms are indefinite.'" (quoting *Richard Barton Enters. v. Tsern*, 928 P.2d 368, 373 (Utah 1996))); *see also Candland v. Oldroyd*, 67 Utah 605, 608, 248 P. 1101, 1102 (1926) ("So long as there is any uncertainty or

indefiniteness, or future negotiations or considerations to be had between the parties,

there is not a completed contract. In fact, there is no contract at all.").

"Whether the parties had a meeting of the minds sufficient to create 'a binding

contract is . . . an issue of fact,'" *LD III, LLC* at ¶ 13, 221 P.2d at 871 (quoting *O'Hara v.*

*Hall*, 628 P.2d 1289, 1291 (Utah 1981)), and this court made findings of fact as to the

integral features of the agreement to which the parties mutually assented at the meeting

on May 27, 1996, as quoted above, including the Bank's express agreement to follow the

instructions of Preston Jones as Orient's sole representative with authority over Orient's

funds.  (*See* Find./Conc. at 122, ¶¶ 350-52; 125-26 ¶ 363; 188-89 ¶ 16.)[49]  Those findings

---

[49]Plaintiffs' counsel argued to the court of appeals that this court "failed to engage in any meaningful analysis of offer and acceptance," and thus "failed to understand the significance of Orient's acceptance in the U.S."  (Response and Reply Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 26.)  This court analyzed Orient Mineral's contractual relationship with the Bank in terms of *mutual assent*—"a meeting of the minds on the integral features of an agreement," *Nielsen v. Gold's Gym*, at ¶ 11, 78 P.3d at 602, of which offer and acceptance prove an integral part—and found its essential terms to be "reflected in Mme. Liu's May 14th letter . . . as well as Orient Mineral's May 16th board resolution and cover letter (PX-8), first presented to the Bank at the May 27, 1996 meeting."  (Find./Conc. at 125-26 ¶ 363.)

Analyzed solely in terms of offer and acceptance, "[a]cceptance by performance requires that at least part of what the offer requests be performed or tendered," *Restatement (Second) of Contracts* § 50(2) (1981), and "the beginning of performance or a tender of part performance operates as a promise to render complete performance" as requested by the offer.  *Id.* at § 50 comment b.  If Orient's $3 million wire transfer was a tender of part performance, the tender of Orient's May 16th resolution and cover letter as the company's "authorization letter" requested by the May 14th letter continued Orient's acceptance by performance.  The May 16th resolution and cover letter stated terms beyond those set forth in the Bank's May 14th letter—additional terms that may simply have spelled out an implied term of the offer, *cf. id.* at § 59 comment b, or reflected an acceptance by Orient with a request for a "change or addition to the terms of the offer" to which the Bank may assent, *id.* at § 61 & comment a, or if Orient's acceptance of the account at the Bank "depends upon the offeror's further acquiescence in the modification" by the additional terms, *id.* at comment a, then Orient's reply "is not an acceptance but is a counter-offer," *id.* at § 59, which the Bank could then accept or reject.  All three of these conceptual paths lead to a meeting of the minds as to all essential terms at the May 27th meeting in LingBao, as this court found.

To assert that Orient's contract with the Bank concerning the temporary Orient account was "fully formed" by Orient's $3 million wire transfer ignores the terms of the May 14th letter as to what Orient and Yue "must" do to open the account, as well as the parties' subsequent agreement to the additional terms set forth in Orient's May 16th resolution and cover letter at the May 27th meeting in LingBao.  Moreover, if "acceptance

(continued...)

were affirmed by the court of appeals,[50] and Bank counsel's post-mandate argument concerning a "two-contract" theory of indemnification cannot alter that outcome.[51]

Plaintiffs' counsel already argued Orient's unilateral-contract-formation-by-wire-transfer theory before the court of appeals in an effort to domesticate Orient's contract with the Bank and alter the jurisdictional outcome, but to no avail. Indeed, as the court of appeals points out,

---

[49](...continued)
must manifest assent to the same bargain proposed by the offer," *id.* at § 50 comment a, the terms set forth in Wilson's rough draft English translation of Mme. Liu's May 14th letter are *not* identical to those set forth in the letter itself, as explained in the previous note. Orient's "acceptance" of an offer different from the one actually made by the Bank's May 14th letter may not manifest mutual assent. *See id.* at § 20(1); 2 Richard A. Lord, *Williston on Contracts* § 6:59, at 864 (4th ed. 2007) (observing that "when a phrase in a contract . . . is in fact differently understood, there is no contract" (footnote omitted).). Indeed, at the March 20th hearing, plaintiffs' counsel argued that "the May 16, 1996 Orient Mineral board resolution containing the hold harmless arose from a mistake of fact," referring to these differing understandings. (Transcript of Hearing, dated March 20, 2009, at 21-23 (Mr. Ludwig).). Given the language barrier, effective mutual assent between these parties may not have been practicable prior to the May 27th meeting in LingBao.

[50]As recounted by the court of appeals, Orient Mineral "responded to the Bank's [May 14th] letter with the Orient Mineral resolution making Jones its sole representative and agreeing to hold the Bank harmless if it followed Jones' directions." *Orient Mineral*, 506 F.3d at 994. "Eck also drafted a letter to the Bank reiterating these points" and "delivered these two Orient Mineral documents in person to the Bank's Lingbao sub-branch when Eck accompanied Jones to China" for the May 27th meeting. *Id.*
   The court of appeals also noted that this court "agreed" with plaintiffs' assertion that "they created this contract in the United States," 506 F.3d at 994 n.18, which plainly this court did not. (*See* Find./Conc. at 125-26 ¶ 363 ("The terms of the contract between Orient Mineral and the Bank of China, formed in Lingbao, China, . . .").) This minor error may have been induced by the mistaken assertion in plaintiffs' brief that "[t]he district court concluded that when Plaintiffs wired money to the Bank—in reliance on the Bank's written promise to safeguard the funds—that conduct formed a contract. The U.S. was thus the place of the contract's formation." (Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 52.)

[51]Orient Mineral asserts that "courts grant Rule 60(b)(6) relief where judgments were made before key facts were presented to the court." (Orient Rule 60(b) Mem. at 25.) Here, the key facts surrounding the formation of the contract between Orient Mineral and the Bank in May of 1996 were presented through the testimony of several witnesses and relevant exhibits, and are set forth in this court's Findings of Fact. (*See* Find./Conc. at 15-42, ¶¶ 45-120.) The post-remand statements by Bank counsel now highlighted by Orient Mineral add nothing of significance to the existing evidentiary record, let alone "a previously undisclosed fact so central to the litigation that it shows the initial judgment to have been manifestly unjust." *Good Luck Nursing Home, Inc. v. Harris*, 636 F2b 572, 577 (D.C. Cir. 1980).

The Bank did not take any actions in the United States to negotiate the contract. Rather, it negotiated the arrangements for Orient Mineral's temporary account in China with only Yue, as a representative of Orient Mineral and Wil–Bao. It was Yue who forwarded the Bank's letter offering a contract to the United States.

*Orient Mineral*, 506 F.3d at 994 n.18.[52]

Having failed to persuade the court of appeals on direct appeal that this court erred

in its jurisdictional rulings under § 1605(2) of the FSIA, plaintiffs' counsel now argues

_____

[52]As the court of appeals explains:

> the evidence established that it was Yue, a director of Orient Mineral and Wil–Bao's manager, who made arrangements with the Bank, in China, for Orient Mineral to wire $3 million into a temporary account in the Bank's Lingbao subbranch. At Wilson's direction, Yue, in making these arrangements, requested that the Bank draft a letter that would include account routing instructions and a promise to keep Orient Mineral's funds safe until Orient Mineral's representative, Jones, arrived in China. The Bank provided Yue with such a letter, dated May 14, 1996, written in Chinese and addressed to Yue. It was Yue, not the Bank, who sent this letter to Wilson in the United States, . . .

*Orient Mineral*, 506 F.3d at 994.

Even if Orient prevailed on this point, the fact remains that the account transactions that plaintiffs complain of involved the *Wil-Bao* accounts, not the temporary Orient Mineral account. In almost sleight-of-hand fashion, plaintiffs' counsel asserts that the Bank's purported "judicial admission" as to the formation of *Orient*'s contract with the Bank in the United States extends this court's jurisdiction over *Wil-Bao*'s claims arising from four subsequent transfers involving Wil-Bao's accounts that were transacted entirely in China:

> The Bank argues . . . that this Court has previously held that the four transfers out of Wil-Bao's dollar account are not Orient's claims but Wil-Bao's. . . . [T]o the extent that is the case, Wil-Bao can be added or substituted as the real party in interest. *See* Rule 17(a)(3).

(Orient Rule 60(b) Reply at 29 n.26.) Plaintiffs' counsel further argues that "the Bank had previously admitted, which the Court apparently overlooked, that under the language of its May 14, 1996 letter, the 'agreement between Orient and the Bank' included the duty to 'follow the directions of Orient's representative, Preston Jones, in creating the Wil-Bao account....' Bank's Proposed FFCL, ¶ 42." (*Id.*)

This court did not "overlook" the Bank's proposed finding, and as translated by the *plaintiffs*' expert at trial, the Bank's May 14th letter simply doesn't say that. (*See* Find./Conc. at 21-22 ¶ 62.) Mme. Liu's May 14th letter refers to the opening and use of *Orient Mineral*'s account, not the *Wil-Bao* accounts. The Wil-Bao joint venture made its own contract with the Bank with its own essential terms governing Wil-Bao's accounts. (*See* Find./Conc. at 35-38 ¶¶ 104-11; 133 ¶¶ 386-87; 189-90 ¶¶ 21-25 & n.195; 232.)

Plaintiffs pressed this same argument upon the court of appeals to no avail. (*See* Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 82-83; Response and Reply Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 42-43.)

that the court of appeals erred in its jurisdictional analysis under the same section, and

that this court should now disregard the court of appeals' mandate on those issues and

grant plaintiffs the relief they seek under Rule 60(b)(6). Yet "[i]t is clear that a Rule

60(b) motion cannot be used simply to reopen the court of appeals decision, . . . ." 18B

Charles Alan Wright, Arthur B. Miller, & Edward H. Cooper, *Federal Practice and*

*Procedure* § 4478.3, at 748 (footnote omitted). Rule 60(b) "provides the general

procedure for seeking relief on the basis of matters that were not before the appellate

court." *Id.* Plaintiffs' theories of FSIA jurisdiction certainly were before that tribunal.

### h. Rule 60(b)(6) & the Mandate Rule in this Case

It is improper for a court to grant relief under Rule 60(b) if, in doing so, the court

simply revisits arguments which had already been raised and dismissed. *See Van Skiver*

*v. United States*, 952 F.2d 1241, 1244 (10th Cir. 1991). "Rule 60(b)(6) is 'not available

to allow a party merely to reargue an issue previously addressed by the court when the

reargument merely advances new arguments or supporting facts which were available for

presentation at the time of the original argument.'" *F.D.I.C. v. United Pacific Ins. Co.*,

152 F.3d 1266, 1272 (10th Cir. 1998) (quoting *Cashner*, 98 F.3d at 577).

In this case, plaintiffs vigorously and unsparingly argued the theories before the

court of appeals that they now argue before this court under Rule 60(b)(6)—contract

formation in the United States, the Bank's "commercial activity" in the United States, the

credibility of the Bank's witnesses regarding Chinese banking practices, and more—but

they did not prevail on any of them.

Plaintiffs invoke several exceptions to the mandate rule,[53] but have failed to come forward with any "extraordinary circumstances" warranting relief under Rule 60(b)(6) that was not already raised in substance before the court of appeals or resolved on appeal. *Id.* at 1273 (citing *Standard Oil*, 429 U.S. at 18-19). The post-mandate "later events"[54] that plaintiffs now rely on under Rule 60(b)(6) prove to be cumulative of factual assertions they have already made before both courts: a second legal opinion corroborating the testimony of plaintiffs' expert witness at trial;[55] a post-mandate "admission" by Bank counsel as to contract formation in the United States calculated to bolster a jurisdictional theory under the FSIA that the court of appeals expressly rejected.[56] Plaintiffs have not identified "'any issue which was not expressly or impliedly disposed of on appeal'"[57] as a basis for Rule 60(b)(6) relief. Indeed, as to the court of

---

[53]*See* Part D.2.c, *supra*.

[54]*See Standard Oil*, 429 U.S. at 18 ("the appellate mandate relates to the record and issues then before the court, and does not purport to deal with possible later events").

[55]Plaintiffs' proffered "second opinion" states that "[w]e have not found any then applicable laws or regulations in June 1996 pursuant to which conversion of foreign exchange incomes relating to capital account items in an amount below USD 100,000 is legally permitted to be carried out without the Verification Document" issued by the local SAEC or SAFE agency. (Orient Rule 60(b) Mem. at 15 (quoting Exh. G at ¶ 15).) Plaintiffs' expert already testified at trial that "[t]here was absolutely nothing like that." (Transcript of Trial, dated April 23, 2004, at 23:7-24:20 (Mr. Harner); see Find//Conc. at 48 ¶ 143 & n. 42.)

[56]Plaintiffs' counsel even argues that these are "circumstances not known to either court," (Orient Rule 60(b) Mem. at 3), on the same page that counsel asserts that the court of appeals "also concluded" that "Orient's contract was formed in the United States," *id.* at 3 n.5—the precise point now purportedly "admitted" by the Bank.

[57]*Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1126 (10th Cir. 2003) (quoting *Newball v. Offshore*

(continued...)

appeals' jurisdictional analysis under the FSIA, the plaintiffs invite this court to go "too far," and grant, "in effect, a rehearing of the appellate court's decision." 11 Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2873, at 439-40.[58]

Plaintiffs "fail to make the more compelling showing of extraordinary circumstances required for relief under Rule 60(b)(6)." *Dowell*, 8 F.3d at 1509 (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863-64 (1988); *Ackermann v. United States*, 340 U.S. 193, 200-02 (1950)). They have not shown a dramatic change in controlling legal authority; significant new evidence that was not earlier obtainable through due diligence but has since come to light; or a blatant error in the prior decision would result in serious injustice if not corrected. Consequently, this court cannot overturn the court of appeals' jurisdictional determinations under the FSIA or its affirmance of this court's findings and judgment in the Bank's favor on the merits of the plaintiffs' claims involving the $400,000 wire transfer. Because the court of appeals'

---

[57](...continued)
*Logistics Int'l*, 803 F.2d 821, 826 (5th Cir. 1986)).

[58]Plaintiffs now argue under Rule 60(b) the same expansive reading of FSIA jurisdiction over their claims under all three clauses of 28 U.S.C. § 1605(a)(2) that they asserted before, during and after trial in April of 2004, and on direct appeal to the Tenth Circuit. (*Compare, e.g.*, Plaintiffs' Bench Memorandum on FSIA Jurisdiction, filed January 24, 2005 (dkt. no. 335), at 1-11, *with* Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 34-64; Response and Reply Brief of Appellants, *Orient Mineral Co. v. Bank of China*, Case Nos. 05-4037 & 05-4048 (10th Cir.), at 7-36; *and* Orient Rule 60(b) Mem. at 30-42; Orient Rule 60(b) Reply at 26-28.) The court of appeals addressed these arguments at some length," *see Orient Mineral*, 506 F.3d at 991-1000, concluding that this court "correctly held in this case that it did not have subject matter jurisdiction over Plaintiffs' claims that were not based upon the act of the Bank in transferring $400,000 from Wil–Bao's account in the Bank's Lingbao sub-branch to a Utah bank." *Id.* at 1000.

opinion and mandate covered the arguments the plaintiffs make in their Rule 60(b)(6)

motion, this court is bound by the mandate rule and has no authority to re-examine its

final decision. *See Procter & Gamble*, 317 F.3d at 1126; *Huffman*, 262 F.3d at 1132-33.

Here, "the mandate rule[ ] provides that a district court must comply strictly with the

mandate rendered by the reviewing court," *Huffman*, 262 F.3d at 1132 (internal quotation

marks omitted), and consistent with that principle, the plaintiffs' "Cross-Motion for

Default Upon Orient's Counterclaim and for Relief from Judgment" must be denied.

For the reasons explained above in some detail,

**IT IS ORDERED** that the Bank of China's Motion to Review Taxation of Costs

(dkt. no. 358), is GRANTED, and pursuant to Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920,

and costs shall be taxed in this case in the amount of **$28,109.27**;

**IT IS FURTHER ORDERED** that Orient Mineral's motion to dismiss the Bank

of China's Amended Counterclaim (dkt. no. 393), is GRANTED; and the individual

counterclaim defendants' motion to dismiss the Bank's Amended Counterclaim (dkt. no.

400), is also GRANTED;

**IT IS FURTHER ORDERED** that Orient Mineral's motion for entry of default

on the paper styled as a counterclaim to the Bank's counterclaim (dkt. no. 427), is

DENIED; Orient Mineral's conditional request for leave to file an answer and

counterclaim as set forth in  Plaintiffs' Reply in Support of  Cross-Motion for Default

Upon Orient's Counterclaim and for Relief from Judgment (dkt. no. 449), at 14 n.13, is

DENIED; and the paper styled as an "Answer and Counterclaim of Orient Mineral

Company to Bank of China's Amended Counterclaim" (dkt. no. 452), filed on March 18,

2009 by Orient Mineral without prior leave of this court, is hereby STRICKEN;

**IT IS FURTHER ORDERED** that the Bank of China's motion for summary

judgment as to Orient Mineral's putative counterclaim-in-reply (dkt. no.432), is

GRANTED IN PART AND DENIED IN PART AS MOOT; and

**IT IS FURTHER ORDERED** that the plaintiffs' "Cross-Motion for Default

Upon Orient's Counterclaim and for Relief from Judgment" (dkt. no. 439) is DENIED in

all respects.

DATED this _18_ day of February, 2010.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge